Robert Kenney
Nicholas B. Malito
HOFHEIMER GARTLIR & GROSS, LLP
530 Fifth Avenue
New York, New York  10036
Telephone: 212-818-9000
Facsimile: 212-869-4930
rkenney@hgg.com
nmalito@hgg.com

-and-

Panagiota Betty Tufariello
INTELLECTULAW
THE LAW OFFICES OF P.B. TUFARIELLO, P.C.
25 Little Harbor Road
Mount Sinai, New York 11766
Telephone: 631-476-8734
Facsimile: 631-476-8737
betty@intellectulaw.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- :
                                                           :
GENOMETRICA RESEARCH INC., and THE      : Case No. 11-cv-05802 (ADS)
RESEARCH FOUNDATION OF THE STATE        : (AKT)
UNIVERSITY OF NEW YORK, pursuant to Art.  :
VII of its July 1, 1999 Exclusive License     : Jury Trial Demanded
Agreement with GENOMETRICA RESEARCH      :
INC.,                                                      :
                                                           :
                      Plaintiffs,                          :
                                                           :
            -against-                                      :
                                                           :
BORIS GORBOVITSKI, VERA GORBOVITSKI      :
a/k/a VERA GORFINKEL, and ADVANCED        :
BIOMEDICAL MACHINES INC.,                 :
                                                           :
                      Defendants.                         :
                                                           :
---------------------------------------------------------- :

## FIRST AMENDED COMPLAINT

Plaintiff GENOMETRICA RESEARCH INC., by its attorneys, HOFHEIMER GARTLIR & GROSS, LLP and INTELLECTULAW, THE LAW OFFICES OF P.B. TUFARIELLO, P.C., and THE RESEARCH FOUNDATION OF THE STATE UNIVERSITY OF NEW YORK, pursuant to Article VII of its July 1, 1999 Exclusive License Agreement with Genometrica Research Inc., for their First Amended Complaint against Defendants BORIS GORBOVITSKI, VERA GORBOVITSKI a/k/a VERA GORFINKEL, and ADVANCED BIOMEDICAL MACHINES INC., respectfully allege and aver as follows:

## THE PARTIES

1.      Plaintiff Genometrica Research Inc. ("Genometrica"), formerly known as "Biophotonics Corporation", is a privately owned corporation which is incorporated in the State of Delaware and authorized to do business in the State of New York as a foreign corporation.  Genometrica's principal place of business is in Hauppauge, County of Suffolk, and State of New York.

2.      The Research Foundation of State University of New York, is a "non-profit educational corporation chartered by the Board of Regents and existing under the laws of the State of New York, and having a principal offices at 411 State Street, Albany, New York, 12203 and a mailing address at P.O. Box 9, Albany, New York 11201" (the "Foundation").

3.      Defendant Boris Gorbovitski ("Gorbovitski") is an individual residing in East Setauket, County of Suffolk, and State of New York.  Gorbovitski is the husband of Defendant Vera Gorbovitski a/k/a Vera Gorfinkel.

4.     Defendant Vera Gorbovitski a/k/a Vera Gorfinkel ("Gorfinkel") is an individual residing in East Setauket, County of Suffolk, and State of New York. Gorfinkel is the wife of Gorbovitski.

5.     Defendant Advanced BioMedical Machines Inc. ("ABMM") is a Delaware corporation that is qualified as a foreign corporation authorized to do business in the State of New York.  ABMM's principal place of business is in East Setauket, County of Suffolk, and State of New York.  ABMM has reported to the State of Delaware that Gorbovitski is its chairman and/or chief executive officer.

6.     Gorbovitski, Gorfinkel, and ABMM are collectively referred to herein as "Defendants."

## JURISDICTION AND VENUE

7.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1338(a), 1338(b), and 15 U.S.C. § 1121(a).  Supplemental jurisdiction exists over all other claims pursuant to 28 U.S.C. § 1367(a).

8.     This Court has personal jurisdiction over all Defendants because they are all engaged in substantial and regular business in the State of New York and in the Eastern District of New York.  Personal jurisdiction further exists as to Gorbovitski and Gorfinkel by virtue of their residing in the Eastern District of New York, and as to ABMM because it maintains a place of business in the Eastern District of New York. Defendants' acts have caused injury to Genometrica within the Eastern District of New York.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) and (c) by reason that Defendants are located in this District, a substantial portion of the events giving rise to Genometrica's claims occurred within this District, and the property that is the object of this action is and/or was located in this District.  Venue is also proper in the Eastern District of New York pursuant to 28 U.S.C. § 1400 in that Gorbovitski and Gorfinkel reside in this District and ABMM has at least one regular and established place of business in this District.

**PRELIMINARY STATEMENT**
**SUMMARY OF FACTS**

10.     The Foundation helps the State University of New York ("SUNY") (a) "acquire and manage grants and contracts from external sponsors;" (b) "move inventions made at campuses to the marketplace to benefit society and the New York State Economy;" and (c) "create environments where SUNY faculty, staff and students can collaborate with private and public organizations."  *See the Foundation's website:* https://portal.rfsuny.org/portal/page/portal/The%20Research%20 Foundation%20of%20SUNY/home/What_we_do/RF_Overview.

11.     The Foundation's corporate headquarters are located in Albany, New York.  It works in conjunction with operating units at 29 campus locations across New York State, including SUNY-Stony Brook, Stony Brook, New York ("Stony Brook").

12.     Since its incorporation in 1996 by Gorfinkel, among others, Genometrica has been engaged in the research and development of a biomedical device known as a DNA analyzer and sequencer to be used principally for DNA mutation detection and discovery, and the technology relating thereto (collectively, the "Medical Device"),

during all relevant times pursuant to research agreements with the Foundation (the "Research Agreements").

13.     Gorfinkel is aware, and upon information and belief Gorbovitski and ABMM also are aware, that if Genometrica's technology platform is applied to the emerging field of copy number variation discovery, the ultimate result enables its users to reveal causative mutations for diseases such as Autism, Alzheimer's, Parkinson's, and Type 2 Diabetes and pharmaceutical companies to identify the unique genetic loci which are responsible for predicting drug efficacy and safety as well as pinpoint new biological pathways for which to develop therapeutic interventions; and that the financial value associated with owning the intellectual property rights to use novel causative mutations in diagnostics-personalized medicine and drug discovery has been estimated to be in excess of $1 billion per disease.

14.     On or about July 1, 1999, Genometrica and the Foundation entered into a license agreement. A copy of the License Agreement is annexed hereto as **Exhibit 1**.

15.     Pursuant to the terms of the License Agreement the Foundation: a)  is the owner of all right, title, and interest in and to any technology or discovery, whether patentable or not, made or conceived by certain of Foundation's employees (and Genometrica's co-founders), Gorfinkel and Professor Serge Luryi ("Luryi") (collectively, the "Inventors"), involving the development of an inventive process known as "Automated DNA Sequencing Data Acquisition;"  and b) granted to Genometrica an exclusive worldwide license to use such technologies and discoveries in Genometrica's Medical Device in return for the payment of certain royalties.

16.     The License Agreement enumerates the subject inventions existing as of July 1, 1999, and expressly states that they are included within the technology licensed exclusively to Genometrica.

17.     The License Agreement also expressly states that those inventions discovered in the future by the Inventors, whether alone or together with any co-inventors, during the Research Program at Stony Brook relating to "Automated DNA Data Sequencing Acquisition," are also included within the technology exclusively licensed to Genometrica by the License Agreement.

18.     Pursuant to certain research agreements, Genometrica has been working with the Foundation on the research and development of its Medical Device since 1999.

19.     Upon information and belief, Genometrica and the Foundation entered into their first Research Agreement, related to the development of Genometrica's Medical Device, on or about September 1, 1999.  Copies of the two most recent Research Agreements are annexed hereto and made a part hereof as **Exhibits 2.**

20.     Each of Genometrica's Research Agreements with the Foundation relating to the Medical Device, identified Genometrica as the external sponsor (the "Sponsor") of the named research project, appointed a Principal Investigator/Project Director ("PI/PD") responsible for the supervision and completion of the extremely detailed research and development plan entitled "The Scope of Work" attached as an exhibit to the Agreement, and fixed the amount of money to be paid to the Foundation by Genometrica as the Sponsor to fund The Scope of Work.

21.     Defendant Gorfinkel is the only PI/PD that each relevant Research Agreement has named.

22.     As the named PI/PD, Gorfinkel has been the person responsible for preparing, in close consultation with Genometrica, The Scope of Work and for supervising its performance.

23.     All the research under the relevant Research Agreements has been conducted under Gorfinkel's supervision in her Stony Brook laboratory.

24.     Each Research Agreement obligates the Foundation to deliver to Genometrica a report of the results of the sponsored research, to enable Genometrica to learn and understand the results and then determine what additional research and other work should be performed in order for Genometrica to achieve the successful development and commercialization of its Medical Device to the mutual financial benefit of both Genometrica and the Foundation.

25.     As the named PI/PD, Gorfinkel has also been responsible for preparing for the Foundation the reports it is required to deliver to Genometrica pursuant to these Research Agreements.  However, Gorfinkel has not prepared all the required reports.

26.     Since January 1, 2008, and pursuant to its Research Agreements with the Foundation, Genometrica has paid to the Foundation approximately $2.2 million for the Genometrica-sponsored research conducted at Stony Brook in connection with the Medical Device and related patent expenses.

27.     During the performance of the Scopes of Work under the Research Agreements in connection with Genometrica's Medical Device, inventions (including know-how) may be made in whole or in part by the PI/PD and others obligated legally to assign their rights thereto to the Foundation.  Each relevant Research Agreement governs the ownership and licensing of such inventions, providing that either (a) if, as anticipated,

such inventions relate to and are in furtherance of the License Agreement, then any and all of the Foundation's rights to such "inventions, technology, patents, know-how and related intellectual property" would be included in the License Agreement, as a result of which they would be licensed exclusively to Genometrica pursuant to the terms of the License Agreement; or (b) be subject to an option to be granted to Genometrica, exercisable for 90 days, allowing Genometrica to acquire an exclusive license thereto, and, if Genometrica duly exercises such option, then a mutually acceptable license agreement shall be negotiated by the parties. To date, the Foundation has not given any notice to Genometrica that any such option rights have been triggered.  On the other hand, to date, a number of such inventions have become the subject matter of patents issued by, and patent applications currently pending in, the United States Patent and Trademark Office ("USPTO").

28.    According to the minutes of the Genometrica Board of Directors meeting held on March 11, 2005, in March 2005 Genometrica was in a "precarious condition," *i.e.*, it was in need of additional capital.

29.    On March 15, 2005, for the purpose of facilitating Genometrica's ability to obtain additional capital Gorbovitski and Gorfinkel, the inventors or co-inventors of Genometrica's core technology, each entered into a separate agreement with Genometrica (the "Restrictive Covenants Agreement"), pursuant to which they each agreed (a) to assign to Genometrica all of his/her right, title, and interest in and to all inventions, formulas, or other writings in the field of biomedical instrumentation relating to Genometrica's business, *i.e.*, Genometrica's Medical Device; and (b) not to disclose, or to utilize, any of Genometrica's trade secrets, confidential information, knowledge or

data for the benefit of anyone other than Genometrica.  Copies of the Restrictive

Covenants Agreements are annexed hereto and made a part hereof as **Exhibit 3**.

30.     As the principal shareholders of Genometrica, Gorbovitski and Gorfinkel

undoubtedly knew of Genometrica's need for capital.  On information and belief, each

realized that the terms of these Restrictive Covenants Agreements would increase the

likelihood that Genometrica's fundraising would be successful, because these

Agreements strengthened the intellectual property position of Genometrica.  They each

entered into these Agreements willingly, as such Agreements were for their own personal

benefit in that they protected and enhanced the value of their equity interests in

Genometrica.

31.     In the recitals in the Restrictive Covenants Agreement between Gorfinkel

and Genometrica, Gorfinkel acknowledged that she is:

> [T]he inventor and/or co-inventor of the technology which
> is the basis of the Corporation's business and its business
> plans and continues to participate in the scientific and
> technical development of the Corporation's business, and
> her continued participation and involvement in the
> Corporation is important for the Corporation and
> Consultant's equity ownership therein.

32.     Similarly, in the recitals in the Restrictive Covenants Agreement between

Gorbovitski and Genometrica, Gorbovitski acknowledged that he is:

> [T]he inventor and/or co-inventor of the technology which
> is important to the Corporation's business and its business
> plans and continues to participate in the scientific and
> technical development of the Corporation's business, and
> his continued participation and involvement in the
> Corporation is important for the Corporation and
> Employee's equity ownership therein.

33.     In Section 2 of the Terms and Conditions of the Restrictive Covenants

Agreements, both Gorbovitski and Gorfinkel agreed to:

> [D]isclose and assign to [Genometrica] all inventions,
> programs, formulas, flow charts, or other writings in the
> field of biological instrumentation relating to business of
> the character carried on or contemplated by [Genometrica] .
> . .  [which] are to become and remain the property of
> [Genometrica].

34.     In Section 3 of their Restrictive Covenants Agreements, Gorbovitski and

Gorfinkel each agreed that during the term of each of their Restrictive Covenants

Agreements, and at all times thereafter, they would not, except as properly required in the

conduct of Genometrica's business or as authorized in writing by an officer of

Genometrica:

> [P]ublish, disclose or utilize, or authorize or cause anyone
> else to utilize, for the benefit of anyone other than
> [Genometrica], any trade secret or confidential information,
> knowledge or data of [Genometrica] (whether or not
> obtained, acquired or developed by [him] [her]), or any
> data or information relating to the services performed by
> [him] [her] for [Genometrica] relating to any other work of
> [Genometrica] which it or any subsidiary or affiliate was
> doing at the time of [his/her service to Genometrica] and/or
> of which [he] [she] had knowledge….

35.     In accordance with Section 3 of their Restrictive Covenants Agreements,

Gorbovitski and Gorfinkel each also agreed that during the term of each of their

Restrictive Covenants Agreements, and at all times thereafter, they would not disclose or

utilize:

> reports on findings from tests, investigative studies,
> consultations or the like, research, formulations,
> methodology, proposals, systems or instrumentation
> developed by but not generally released by [Genometrica]
> …and all particularized information related thereto…; and
> any other data or information designated

by…[Genometrica]…as confidential or proprietary or not
generally and publicly known.  (Emphasis added.)

36.     Section 3 of the Restrictive Covenants Agreements clearly and absolutely

bars both Gorbovitski and Gorfinkel from publishing, disclosing or utilizing, or

authorizing any third party use of, any of Genometrica's intellectual property related to

Genometrica's Medical Device for the benefit of anyone other than Genometrica.

37.     In furtherance of such absolute bar, in Section 7 of their Restrictive

Covenants Agreements, Gorbovitski and Gorfinkel each agreed that:

the remedy at law for a breach of this Agreement [would
be] inadequate and the damages from the breach thereof
would be irreparable and that any party hereto shall be
entitled to preliminary and permanent injunctive relief
(mandatory or otherwise) and specific performance hereof
without the necessity of proving any damages.  (Emphasis
added.)

38.     Finally, in Section 8 of their Restrictive Covenants Agreements,

Gorbovitski and Gorfinkel each agreed to continue to be bound by provisions of Section

3 even if Genometrica failed to raise the additional capital it sought and the Restrictive

Covenants Agreements otherwise became null and void:

Notwithstanding the foregoing, if [Genometrica] does not
obtain not less than $1,000,000 in equity or debt financing
on or before December 31, 2006 or if [Genometrica] does
not enter into an agreement of joint venture with, or sell its
assets or capital stock or merge with another company prior
to December 31, 2006, then this Agreement shall be
deemed null and void and neither [Genometrica] nor
[Gorbovitski and Gorfinkel] will have any obligations to
each other with respect to any matters herein provided for
except with respect to Section 3 hereof.  (Emphasis added.)

39.     Thus, according to the express provisions of Section 8, Gorbovitski and Gorfinkel agreed that, even if Genometrica's fundraising efforts failed before the December 31, 2006 deadline and the Restrictive Covenants Agreements therefore were deemed null and void, they each still would be bound by their non-utilization, non-disclosure covenants set forth in Section 3 thereof, which they acknowledged and agreed would remain in full force and effect.

40.     Accordingly, Gorbovitski and Gorfinkel are -- to this day -- bound by Section 3 of their Restrictive Covenants Agreements with Genometrica and Section 7 with respect thereto.  To wit, Gorbovitski and Gorfinkel cannot and may not <u>disclose or utilize</u>:

> reports on findings from tests, investigative studies, consultations or the like, <u>research</u>, <u>formulations</u>, <u>methodology</u>, proposals, <u>systems</u> or <u>instrumentation</u> developed by but not generally released by [Genometrica] …and <u>all</u> particularized information related thereto…; and any other data or information designated by…[Genometrica]…as confidential or proprietary or not generally and publicly known.  (Emphasis added.)

41.     In July 2008, in consideration of their receipt $4 million in cash, Genometrica's stockholders sold, assigned and transferred to Invar Consulting, Ltd. all of their right, title and interest in and to their Genometrica stock.  As a result, Gorbovitski and Gorfinkel, as major shareholders of Genometrica, received for the sale of their stock approximately $1.8 million, or approximately 45% of said $4 million sales price.  Neither Gorbovitski nor Gorfinkel have been stockholders of Genometrica since then.

42.     However, after the July 2008 sale of Genometrica, Gorbovitski continued to serve as the sole director and sole executive officer of Genometrica, positions he held through August 2011.

43.     On September 24, 2008 (only two months after Gorbovitski had sold his Genometrica stock), while Gorbovitski continued to serve as the sole director and sole executive officer of Genometrica and had the related fiduciary duties to Genometrica, and notwithstanding the effectiveness of Gorbovitski's non-disclosure, non-utilization agreements with Genometrica in Section 3 of his Restrictive Covenants Agreement, Gorbovitski submitted to the National Institutes of Health ("NIH") an Application for Federal Assistance (the "Grant Application") in the name of Defendant ABMM.

44.     The Grant Application was for a research project entitled "Data Acquisition System for Multiplex Analysis of Color Encoded Particles," a title remarkably similar to the name of invention the Foundation had licensed exclusively to Genometrica known as "Automated DNA Sequencing Data Acquisition" and the project titles on the Scopes of Work under the Research Agreements( Exhibits 2 ) between Genometrica and the Research Foundation, *i.e.*, "Development of the instrument for detection and recognition of color encoded beads", both of which Gorbovitski was totally familiar with as the sole director and sole executive officer of Genometrica.

45.     Gorbovitski signed this Application as President of ABMM.  A copy of the Grant Application is annexed hereto and made a part hereof as **Exhibit 4**.

46.     The Grant Application in the name of ABMM sought total estimated funding of $2,350,000 for the four-year research period proposed to start on August 1, 2009 and end on January 31, 2013.

47.     On or about August 10, 2009, the NIH awarded to ABMM Grant 4R42CA140109-01 in the amount of $100,231 for the 12 months ending June 30, 2010.

48.     Notwithstanding Gorbovitski's fiduciary duties to Genometrica as its sole director and sole executive officer, and notwithstanding the fact that he remained bound by Section 3 of his Restrictive Covenants Agreement with Genometrica, Gorbovitski caused ABMM to be created in Delaware on August 17, 2009 for the purpose of accepting and performing Grant 4R42CA140109-01 and thereby competing directly with Genometrica in the research and development of ABMM's own DNA analyzer and sequencer (the "ABMM Sequencer").

49.     Upon information and belief, since ABMM's inception Gorbovitski has been ABMM's chairman and/or chief executive officer and Gorbovitski and/or Gorfinkel have owned 100% of ABMM'S capital stock.

50.     Gorbovitski wrongfully concealed from Genometrica his creation, control and ownership of ABMM; and all his actions taken in the name and on behalf of ABMM breached his fiduciary duties to Genometrica.

51.     Based on periodic progress reports submitted by ABMM, the NIH provided additional funding to ABMM by awarding it Grants 4R42CA140109-02 and 4R42CA140109-03 in the amounts of $795,459 and $778,161 for the 12 months ending June 30, 2011 and 2012, respectively.

52.     The NIH grants to ABMM for the ABMM Sequencer, which have approximated $1.7 million, were wrongfully and fraudulently obtained by ABMM.

53.     The ABMM research project described in the Grant Application is a logical extension and continuation of Genometrica's research and development of its Medical Device.

54.     On information and belief, in 2008, before Genometrica was sold to Invar Consulting Ltd. in August 2008,  Gorbovitski as the sole executive officer of Genometrica, and Gorfinkel as the PI/PD under Genometrica's relevant Research Agreements with the Foundation, began conceptualizing, planning and/or preparing for Genometrica an NIH grant application substantially identical to the one actually filed by ABMM.  However, after the sale of Genometrica they decided to misappropriate such application from Genometrica and submit it, almost word-for-word, in the name of a corporation they would form, i.e., ABMM, if and when the NIH awarded the grant.

55.     The ABMM Grant Application wrongfully incorporates, discloses and describes, and claims for ABMM the right to utilize, practice and exploit, the technology the Foundation licensed exclusively to Genometrica pursuant to the Research and License Agreements.

56.     In preparing and filing ABMM's Grant Application, and in performing the research described therein, Gorbovitski and Gorfinkel each wrongfully disclosed, and each wrongfully allowed ABMM to utilize, and Gorfinkel herself wrongfully utilized, the confidential information of Genometrica which they had agreed in their Restrictive Covenants Agreements not to disclose to any third party or to utilize except for Genometrica's benefit.

57.     Gorbovitski and Gorfinkel each violated the terms of their Restrictive Covenants Agreement by misappropriating from Genometrica and wrongfully disclosing to ABMM, and allowing ABMM to utilize, Genometrica's research, plans, intellectual property, Scopes of Work, data, and other information.  For example, certain pictures and charts presented, and the substantiation of measurements of fluorescence described, in the

Grant Application were originally contained in the confidential written presentations dated October 24, 2008 and/or May 7, 2009, which Gorfinkel had prepared and delivered to or for the benefit of Genometrica.

58.     Gorbovitski caused ABMM to utilize the proprietary and confidential information belonging to Genometrica to wrongfully obtain for ABMM the money to fund, and to induce the Foundation to provide the facilities and staff of the Foundation and/or Stony Brook to undertake pursuant to one or more research agreements between ABMM and the Foundation, the research and development of the ABMM Sequencer, all to the detriment of Genometrica.

59.     As set forth in the Grant Application, Gorbovitski said that this ABMM project would be coordinated by Gorbovitski as the "PD/PI" and by Gorfinkel as "Co PD/PI", and that the research would be conducted by unnamed individuals whose jobs were described and also by the following named persons: E. Hatchwell, G. Gudkov, A. Stepukhovich, G. Tyshko, D. Gavrilov, and A. Tsupryk.

60.     Upon information and belief, all of these named personnel except Mr. Hatchwell then were, and they still are, employees of Stony Brook or the Foundation; at all relevant times they worked under Gorfinkel's supervision performing research pursuant to Genometrica's Research Agreements with the Foundation, they wrongfully acquired from Gorbovitski and/or Gorfinkel knowledge of the intellectual property owned by the Foundation and licensed exclusively to Genometrica and they utilized the same for the benefit of ABMM beginning in August 2009 after ABMM was formed and its Grant Application was approved by the NIH.

61.     In addition, at all relevant times through August 2011, Gorbovitski received from Genometrica a substantial salary, and all such named persons except Mr. Hatchwell received from Genometrica consulting fees allegedly for services rendered to Genometrica in connection with Genometrica's Medical Device, pursuant to Genometrica checks signed by Gorbovitski as

62.     Along with its June 28, 2010 letter to the NIH, ABMM delivered to the NIH its Commercialization Plan Update, June 2010.

63.     Gorbovitski had misappropriated the contents of the confidential Business Plan of Genometrica. He did so virtually word-for-word, obtaining such Business Plan from Genometrica under the false pretense that he wanted to show it to potential investors.

64.     ABMM publicly holds out that it is developing and commercializing a DNA analyzer and sequencer that, according to ABMM's own marketing materials, is substantially similar if not identical to, based on or a natural progression/next generation of Genometrica's Medical Device.  Further, ABMM publicly holds out in its marketing materials that its device employs and exploits inventions, technology patents, know-how, trade secrets and related intellectual property and other information that, as alleged herein, belong to Genometrica; all of which ABMM could have obtained only from Gorbovitski and/of Gorfinkel.

65.     Gorbovitski and Gorfinkel caused and allowed ABMM to utilize Genometrica's intellectual property in violation of the very specific and crystal-clear Restrictive Covenants Agreements that Gorbovitski and Gorfinkel executed and delivered to Genometrica on March 15, 2005.

66.     Upon information and belief, these NIH grant monies -- along with the other fruits of Gorbovitski's, Gorfinkel's and ABMM's misrepresentations regarding ABMM's ownership and right to use the intellectual property the Foundation had licensed exclusively to Genometrica -- have enabled ABMM to sponsor and pay for research carried out at Stony Brook by Gorfinkel pursuant to one or more research agreements with the Foundation, and to directly compete with Genometrica in commerce, by promoting, marketing, offering for sale and selling the ABMM Sequencer.

67.     Upon information and belief, Gorbovitski, Gorfinkel and ABMM have promoted, marketed, and offered for sale the ABMM Sequencer to, among others, Cold Spring Harbor Laboratory, Memorial Sloan Kettering Cancer Center, Brookhaven National Laboratory, and most recently at the Suffolk Police Medical Center.

68.     Finally, as more fully described below, while Gorbovitski was still serving as the sole director and the sole executive officer of Genometrica, and Gorbovitski, Gorfinkel and ABMM were misappropriating Genometrica's intellectual property, Gorbovitski was also misappropriating hundreds of thousands of dollars of Genometrica's funds.

## FACTS COMMON TO ALL CLAIMS OF RELIEF

### RELEVANT CORPORATE HISTORY OF GENOMETRICA RESEARCH INC., F/K/A BIOPHOTONICS CORPORATION

69.     On or about 1996, Genometrica was co-founded by Gorfinkel and Luryi, a non-party to the present matter, under the name BioPhotonics Corporation and incorporated in Delaware.  It has remained at all times a Delaware entity authorized to do business in the State of New York.  Because, as discussed below, BioPhotonics

Corporation was later re-named Genometrica Research, Inc., Plaintiff will be referred to throughout this First Amended Complaint as "Genometrica."

70. At all relevant times, Genometrica has been engaged in the development of its Medical Device, as defined above -- a biomedical device known as a DNA analyzer and sequencer, along with its related technology.

71. From 1996 to January 1999, Gorfinkel served as Vice President and Treasurer of Genometrica. She also served as one of three directors of Genometrica until April 2000.

72. Upon information and belief, at all relevant times through the present, Gorfinkel has also been employed by and is a tenured professor at Stony Brook, where she operates the research laboratory that has been performing sponsored research for Genometrica, and more recently, for ABMM.

73. From January 1999 to August 2011, Gorbovitski served as Genometrica's President and Treasurer and its sole executive officer. Gorbovitski also served as a director of Genometrica from January 2004 to August 2011, and as its sole director from July 2008 to August 2011. His relationship with Genometrica was terminated in August 2011.

74. Between 1996 and 2008, Gorbovitski and Gorfinkel were issued in excess of 5.3 million shares of Genometrica stock, as a result of which, by 2008, they jointly owned approximately 45% of Genometrica's shares.

75. In February 2008, pursuant to an agreement with Invar Consulting, Ltd. ("Invar"), which is not a party to the present case, Genometrica sold 8% of its stock to Invar for $400,000, and Invar expressed its desire to acquire all of Genometrica.

76.     Gorbovitski and Gorfinkel maintained a controlling stock interest in Genometrica until July 2008, when Invar purchased the balance of Genometrica's outstanding stock for $4 million in cash.  As a result, Gorbovitski and Gorfinkel, as 45% shareholders of Genometrica, divested themselves of their Genometrica stock in exchange for which they received approximately $1.8 million in cash.

77.     On January 5, 2009, Gorbovitski, in his capacity as sole director of Genometrica, executed a "Board Resolution" whereby he approved all actions taken by himself as President of Genometrica, which he believed to be appropriate and beneficial for Genometrica.

78.     Under Delaware corporate law, where, as here, the corporation has no disinterested director, such a self-serving resolution is ineffective without stockholder approval thereof.  Gorbovitski never obtained the requisite stockholder approval.

79.     Accordingly, this "Board Resolution" was nothing more than an errant attempt by Gorbovitski to sanitize his past, present, and future acts of pilfering Genometrica and misappropriating its intellectual property, confidential information and financial resources for the Defendants' benefit.

**GENOMETRICA'S LICENSE AND RESEARCH AGREEMENTS; INTELLECTUAL PROPERTY RIGHTS**

80.     As was set forth herein above, on or about July 1, 1999, Genometrica and the Foundation entered into a License agreement (**Exhibit 1**).

81.     Pursuant to the terms of the License Agreement between Genometrica and the Foundation, the Foundation is the owner of all right, title, and interest in and to any technology or discovery, whether patentable or not, made or conceived by the Foundation's employees (and Genometrica's co-founders) Gorfinkel and Luryi, *i.e.*, the

Inventors, and involving the development of the "Automated DNA Sequencing Data Acquisition."

82.     Further, pursuant to the terms of the License Agreement, the Foundation granted to Genometrica an exclusive worldwide license to use such technologies and discoveries in Genometrica's Medical Device in return for the payment of certain royalties.

79. The License Agreement enumerates the subject inventions existing as of July 1, 1999, and expressly states they are included within the technology licensed exclusively to Genometrica pursuant thereto.

80. The License Agreement also expressly states that those inventions discovered in the future by the Inventors, whether alone or together with any co-inventors, during the Research Program at Stony Brook relating to "Automated DNA Data Sequencing Acquisition," are also included within the technology exclusively licensed to Genometrica by the License Agreement.

81. Pursuant to certain research agreements, Genometrica has been working with the Foundation on the research and development of its Medical Device since 1999.

82. On information and belief, Genometrica entered into its first Research Agreement with the Foundation related to the development of Genometrica's Medical Device on or about September 1, 1999.

83. Since January 1, 2008, and pursuant to its Research Agreements with the Foundation, Genometrica has paid the Foundation approximately $2.2 million for research conducted at Stony Brook in connection with Genometrica's Medical Device and for the patent application processing and legal fees associated therewith.

84. Each of Genometrica's Research Agreements with the Foundation identifies Genometrica as the external Sponsor.  Each of Genometrica's Research Agreements also identifies a specific research project relating to the Medical Device, the Principal Investigator/Project Director ("PI/PD") responsible for the supervision and completion of the specific research project, and fixed the amount to be paid by Genometrica as the Sponsor to the Foundation in connection with the specific research project.

85. In furtherance of the identified research project relating to the Medical Device, each of the Research Agreements is also accompanied by an extremely detailed research and development plan titled "The Scope of Work."  The Scope of Work is prepared by the PI/PD in close consultation with Genometrica, approved by the Foundation and then attached as an exhibit to the Research Agreement and made an integral part thereof.

86. During the performance of the Scopes of Work under the Research Agreements relating to Genometrica's Medical Device, inventions (including know-how) may be made in whole or in part by the PI/PD and others obligated legally to assign their rights thereto to the Foundation.

87. Each relevant Research Agreement governs the ownership and licensing of such inventions, providing that either (a) if, as anticipated, such inventions relate to and are in furtherance of the License Agreement, then any and all of Foundation's rights to such "inventions, technology, patents, know-how and related intellectual property" would be included in the License Agreement, as a result of which they would be licensed exclusively to Genometrica pursuant to the terms of the License Agreement; or (b) be subject to an option to be granted to Genometrica, exercisable within 90 days, allowing

Genometrica to acquire an exclusive license thereto, and if Genometrica duly exercises such option a mutually acceptable license agreement shall be negotiated by the parties.

88.  To date, the Foundation has not given to Genometrica notice that any such option rights have been triggered.

89. On the other hand, to date, a number of inventions relating to and in furtherance of the License Agreement have resulted, and any and all of Foundation's rights to such "inventions, technology, patents, know-how and related intellectual property" have been licensed exclusively to Genometrica pursuant to the terms of the License Agreement.

90. Such inventions have also become the subject matter of patents issued by, and patent applications currently pending in, the United States Patent and Trademark Office ("USPTO"), the fees and costs of which have been paid by Genometrica.

91. Gorfinkel and Gorbovitski are named inventors in many of the patents issued by, and patent applications currently pending in, the USPTO in connection with such inventions implemented in Genometrica's Medical Device.

92.  Specifically, Gorfinkel is named as a co-inventor of the inventions claimed in the following 14 USPTO patent applications prepared, filed and prosecuted by the Foundation at the sole expense of Genometrica and implemented in Genometrica's Medical Device:

> a.  **SINGLE PHOTON SPECTROMETER** US20110108711A1
>
> (U.S. Appl. No. 12/734,365, Pub'd: 2011-05-12);
>
> b.  **ABSOLUTE PCR QUANTIFICATION** US20100137152A1
>
> (U.S. Appl. No. 12/083,407, Pub'd: 2010-06-03);

c. **METHODS AND DEVICES FOR DETECTION AND IDENTIFICATION OF ENCODED BEADS AND BIOLOGICAL MOLECULES** US20090203148A1 (U.S. Appl. No. 12/087,812, Pub'd: August 13, 2009);

d. **SYSTEM AND METHOD FOR CROSS-TALK CANCELLATION IN A MULTILANE FLUORESCENCE DETECTOR** US20070194249A1 (U.S. Appl. No. 11/627,146, Pub'd: August 23, 2007);

e. **MASSIVELY PARALLEL 2-DIMENSIONAL CAPILLARY ELECTROPHORESIS** U.S. Appl. No. 11/922,515;

f. **LIGHT FOCUSING IN LINEAR CHANNEL ARRAYS** US20100163715A1 (U.S. Appl. No. 11/989,788, Pub'd July 1, 2010);

g. **METHOD AND APPARATUS FOR DETECTING RADIATION** US20030123883A1 (Pub'd July 3, 2003);

h. **METHOD AND APPARATUS FOR DETECTING RADIATION** US20040120455A1 (Pub'd June 24, 2004);

i. **METHOD AND APPARATUS FOR DETECTING RADIATION** US20030123058A1 (Pub'd: July 3, 2003);

j. **METHOD AND APPARATUS FOR DETECTING RADIATION** US20030095259 (Pub'd May 22, 2003);

k. **METHOD AND APPARATUS FOR DETECTING RADIATION** US20030095893A1 (Pub'd: May 22, 2003);

l.   **METHOD AND APPARATUS FOR DETECTING RADIATION** U.S. Appl. No. 09/186248, (Filed November 4, 1998);

m.   **METHOD AND APPARATUS FOR DNA SEQUENCING** U.S. Appl. No. 09/454093 (Filed on December 3, 1999);

n.   **METHOD AND APPARATUS FOR COMPRESSION OF DNA SAMPLES FOR DNA SEQUENCING** U.S. Appl. No.: 09/454,094 (Filed on Dec. 3, 1999);

o.   **MULTICAPILLARY BUNDLE FOR ELECTROPHORESIS AND DETECTION FOR DNA** U.S. Appl. No. 09/454429 (Filed December 3, 1999);

p.   **SENSORS FOR DETECTION AND SPECTROSCOPY** U.S. Appl. No.: 09/127,510 (Filed: July 31, 1998);

q.   **METHOD AND APPARATUS FOR IDENTIFYING FLUOROPHORES** US19950561368;

r.   **METHOD AND DEVICE FOR MANIPULATING LIQUIDS IN MICROFLUIDIC SYSTEMS** US20090071833A1 (U.S. Appl. No.:11/975,887, Filed October 22, 2007); and

s.   **SAMPLE ANALYSIS WITH SUCCESSIVE QUANTA TIMING CODE** US19980186248 (Pub'd Nov. 4, 1998).

93. In addition, Gorfinkel is named as a co-inventor in the following patents issued in connection with the inventions implemented Genometrica's Medical Device by

the USPTO and assigned to the Foundation but prosecuted at the sole expense of

Genometrica:

| U.S. PATENT NUMBERS | DATE OF ISSUE | TITLE |
| --- | --- | --- |
| US 7,402,817 B2 | July 22, 2008 | SYSTEM AND METHOD FOR CROSS-TALK CANCELLATION IN A MULTILANE FLURESCENCE DETECTOR |
| US 6,944,407 B2 | September 13, 2005 | METHOD AND APPARATUS FOR DETECTING RADIATION |
| US 6,934,030 B2 | August 23, 2005 | METHOD AND APPARATUS FOR DETECTING RADIATION |
| US 6,771,367 B2 | August 3, 2004 | METHOD AND APPARATUS FOR DETECTING RADIATION |
| US 6,760,109 B2 | July 6, 2004 | METHOD AND APPARATUS FOR DETECTING RADIATION |
| US 6,759,247 B2 | July 6, 2004 | METHOD AND APPARATUS FOR DETECTING RADIATION |
| US 6,528,801 B1 | March 4, 2003 | METHOD AND APPARATUS FOR DETECTING RADIATION |
| US 6,497,804 B1 | December 24, 2002 | METHOD AND APPARATUS FOR DNA SEQUENCING |
| US 6,475,362 | November 5, 2002 | METHOD AND APPARATUS FOR COMPRESSION OF DNA SAMPLES FOR DNA SEQUENCING |
| US 6,464,852 B1 | October 15, 2002 | MULTICAPILLARY BUNDLE FOR ELECTROPHORESIS AND DETECTION FOR DNA |
| US 6,038,023 A3 | March 14, 2000 | SENSORS FOR DETECTION AND SPECTROSCOPY |
| U.S. 5,784,157 | July 21, 1998 | METHOD AND APPARATUS |

FOR IDENTIFYING
FLUROPHORES

94. Likewise, Gorbovitski is named as a co-inventor of the inventions claimed in the following six USPTO patent applications prepared, filed and prosecuted by the Foundation at the sole expense of Genometrica and implemented in Genometrica's Medical Device:

a. **SINGLE PHOTON SPECTROMETER** US20110108711A1 (U.S. Appl. No. 12/734,365, Pub'd: 2011-05-12);

b. **ABSOLUTE PCR QUANTIFICATION** US20100137152A1 (U.S. Appl. No. 12/083,407, Pub'd: 2010-06-03);

c. **METHODS AND DEVICES FOR DETECTION AND IDENTIFICATION OF ENCODED BEADS AND BIOLOGICAL MOLECULES** US20090203148A1 (U.S. Appl. No. 12/087,812, Pub'd: August 13, 2009);

d. **SYSTEM AND METHOD FOR CROSS-TALK CANCELLATION IN A MULTILANE FLUORESCENCE DETECTOR** US20070194249A1 (U.S. Appl. No. 11/627,146, Pub'd: August 23, 2007);

e. **MASSIVELY PARALLEL 2-DIMENSIONAL CAPILLARY ELECTROPHORESIS** U.S. Appl. No. 11/922,515; and

f. **LIGHT FOCUSING IN LINEAR CHANNEL ARRAYS** US20100163715A1 (U.S. Appl. No. 11/989,788, Pub'd July 1, 2010).

95. In addition, Gorbovitski is named as a co-inventor in the following patent issued by the USPTO and assigned to the Foundation the sole expense of Genometrica and implemented in Genometrica's Medical Device: **SYSTEM AND METHOD FOR CROSS-TALK CANCELLATION IN A MULTILANE FLUORESCENCE DETECTOR,** U.S. Patent No. US7,402,817 B2 (Date of Issue: July 22, 2008).

96. To date, the USPTO has issued to the Foundation 12 patents derived from work conducted under the Research Agreements in connection with Genometrica's Medical Device; and Genometrica is the Foundation's exclusive worldwide licensee thereto. Thus, Genometrica's Medical Device includes, *inter alia*, the inventions embodied by the following patents and pending patent applications:

| Foundation Id No. | Patent or Application No. | Title of Invention | Named Inventors |
|---|---|---|---|
| R-7734 | 11/975,887 | Method and Device for Manipulating Liquids in Microfluidic Systems | Gorfinkel and other. |
| R-7324 | 6,475,362 | Method and Apparatus for Compression of DNA Samples for DNA Sequencing | Gorfinkel, Luryi and another |
| R-7329 | 6,464,852 | Multicapillary Bundle for Electrophoresis and Detection for DNA | Gorfinkel, Luryi and another |
| R-7749 | 7,402,817 | System and Method for Cross-Talk Cancellation in a Multilane Fluorescence Detector | Gorbovitski and Gorfinkel and others |
| R-8058 | 11/989,788 | Light Focusing in Linear Channel Arrays | Gorbovitski and Gorfinkel and others[*] |
| R-8060 | 12/087,812 | Methods and Devices for Detection and Identification of Encoded Beads and Biological | Gorbovitski and Gorfinkel and others[*] |

| | | Molecules | |
|---|---|---|---|
| R-8254 | 12/734,365 | Single Photon Spectrometer | Gorbovitski and Gorfinkel, and others |
| R-7886 R-8059 | 12/083,407 | Absolute PCR Qualification | Gorbovitski and Gorfinkel |

## GENOMETRICA'S RESEARCH SINCE 2008

97.     In March 2008, in contemplation of its purchase of Genometrica, Invar entered into a research agreement with Genometrica and provided $700,000 to Genometrica to continue, between April 1 through December 31, 2008, its core research in DNA sequencing (the "Invar Agreement"). A copy of the Invar Agreement is annexed hereto and made a part hereof as **Exhibit 6.**

98.     The parties prepared and attached to the Invar Agreement a detailed Work Plan and Milestones exhibit, which enumerated a sequence of specific objectives and target completion dates for the two named Tasks:  "*Development of Technology for Sequential Color Encoding of Large Sets of Micro-Beads;*" and "*Development of the Data Acquisition System for Ultra-Fast and Highly Accurate Detection, Recording, Data Processing and Recognition of Color Encoded Beads.*"  Invar intended the work would be performed by the Foundation.

99.     From March 15, 2008 through August 31, 2009, pursuant to a Research Agreement between Genometrica and the Foundation, related to the development of Genometrica's Medical Device, Genometrica sponsored a research project entitled "*Development of Automated System for Detection and Recognition of Encoded Beads.*"

100.     On July 1, 2009, pursuant to another Research Agreement, Genometrica sponsored a related research project entitled "*Development of the Instrument for Detection and Recognition of Color-Encoded Beads.*"

101.     During all relevant time periods, Gorfinkel has served as the principal investigator and/or project director under the Research Agreements related to the development of Genometrica's Medical Device, and has been responsible for carrying out the specified research projects at the Stony Brook laboratory that she operates.

102.     Under the Research Agreements, Gorfinkel is also required to prepare the research reports that the Foundation is required to deliver to Genometrica pursuant to the Research Agreements.  The purpose of these reports is to allow Genometrica to learn and understand the results and status of the research, as well as to ascertain the additional research and other work that remain to be done in order for Genometrica to plan for and achieve the successful development and commercialization of the Medical Device, and to budget accordingly.

## THEFT AND MISUSE OF CORPORATE ASSETS

103.     In 2011, Genometrica's parent company undertook a corporate audit of Genometrica's expenses made on and after January 1, 2008, while Gorbovitski was the sole executive officer of Genometrica.  The audit discovered numerous and substantially questionable corporate expenditures.

### A.     Payment of Personal Expenses

104.     For example, Gorbovitski caused Genometrica to pay many of his and Gorfinkel's personal expenditures, including: (i) recurring monthly credit-card payments to American Express, Bank of America, Capital One, Citibank and Key Bank; (ii)

recurring monthly payments to AT&T, T-Mobile, Verizon, and Cablevision, (iii) foreign

travel; (iv) purchases of landscaping, lawn-care services, fuel oil, electricity, water

supply, food, wine and liquor, clothing, flooring, furniture and other items for

Gorbovitski's and Gorfinkel's personal residence; and (v) payment of personal medical

expenses.

105.    Below is a chart summarizing the personal expenses that Gorbovitski and

Gorfinkel charged to Genometrica:

| | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|
| **PERSONAL CREDIT CARDS** | | | | | |
| Citibank | $22,874 | $24,954 | $29,040 | $      14 | $76,882 |
| Bank of America | 25,610 | 24,859 | 3,258 | 1,819 | 55,546 |
| American Express | 9,972 | 24,152 | 3,520 | 9,339 | 46,983 |
| Key Bank | 9,298 | 8,581 | 11,084 | 0 | 28,963 |
| Capital One | 5,242 | 4,108 | 2,479 | 11 | 11,840 |
| | | | | | $220,214 |
| | | | | | |
| **OTHER EXPENSES** | | | | | |
| Auto Leases | 9,548 | 4,305 | 4,287 | 2,846 | 20,986 |
| Foreign Travel | 0 | 0 | 11,989 | 4,522 | 16,511 |
| T-Mobile | 1,284 | 1,262 | 3,309 | 5,682 | 11,537 |
| Rent to Gorfinkel for office space | 2,449 | 1,929 | 5,032 | 0 | 9,410 |
| Verizon | 1,613 | 1,656 | 2,114 | 987 | 6,370 |
| Fuel Oil Companies | 0 | 0 | 1,523 | 4,689 | 6,212 |
| Raymour & Flanagan | 0 | 0 | 4,689 | 0 | 4,689 |
| LIPA (Electricity) | 616 | 0 | 2,369 | 1,298 | 4,283 |
| Retail Stores | 0 | 0 | 3,012 | 412 | 3,424 |
| PayPal | 0 | 0 | 2,464 | 500 | 2,964 |
| Phoenix Floor | 0 | 0 | 2,700 | 0 | 2,700 |
| Computer/GoDaddy.com | 0 | 0 | 0 | 2,186 | 2,186 |
| Cablevision | 430 | 383 | 733 | 495 | 2,041 |
| Wine/Liquor Stores | 0 | 0 | 1,563 | 332 | 1,895 |
| Food/Supermarkets/Drugstores | 0 | 0 | 1,122 | 192 | 1,314 |
| Pool Company | 0 | 0 | 1,290 | 0 | 1,290 |
| AMC Landscaping/Lawn Care | 0 | 0 | 1,043 | 0 | 1,043 |
| Auto/Gas/Parking | 0 | 0 | 720 | 323 | 1,043 |
| Restaurants | 0 | 0 | 772 | 13 | 785 |

| | | | | |
|---|---|---|---|---|
| Suffolk County Water | 0 | 68 | 166 | 526 | 760 |
| U-Haul | 0 | 0 | 503 | 0 | 503 |
| AT&T | 368 | 0 | 0 | 0 | 368 |
| WaterPro | 0 | 0 | 309 | 0 | 309 |
| Medical | 0 | 0 | 85 | 60 | 145 |
| | $16,308 | $9,603 | $51,794 | $25,063 | $102,768 |

**B.** **Unjustified Salary Increases and Unaccounted for Payments**

106.    On October 20, 1999, Genometrica's board of directors (of which Gorfinkel was a member at the time) approved a salary of $40,000 per year for Gorbovitski.

107.    Upon information and belief, the board of directors never authorized an increase in Gorbovitski's salary during the following nine years.

108.    Nonetheless, in 2008, immediately before the sale to Invar, Gorbovitski began causing Genometrica to pay him substantially more compensation than he had ever before received.

109.    Given that Gorbovitski's principal responsibility was to write a monthly check to the Foundation once Genometrica received a deposit from its parent company, these salaries were not commensurate with Gorbovitski's job function.  Despite any title he may have carried, Gorbovitski clearly did not function as a chief executive, chief operating, or chief technology officer.

110.    Based on Genometrica's federal tax returns from 2008 through 2011, Gorbovitski's Genometrica salary was as follows:

| Year | Salary |
|------|--------|
| 2008 | $153,083.00 |
| 2009 | 182,718.00 |
| 2010 | 205,833.00 |
| 2011 | 76,429.00   * |
|      | $618,063.00 |

_____

*Through August 31, 2011 based on Genometrica's cancelled checks.

111.   From March 2008 to July 2011, Gorbovitski also caused Genometrica to issue a series of undesignated checks payable to him, the sum of which is $375,782.48.

112.   These undesignated checks did not bear any "pay-period" notation or any other description or reason for the payments.  A summary of these unaccounted-for payments is based upon a review of Genometrica's checking accounts from 2008 through 2011 and is set forth below:

| Check Date | Amount |
|------------|--------|
| March 31, 2008 | $   4,687.50 |
| January 2, 2009 | 35,550.00 |
| April 7, 2009 | 24,550.00 |
| September 29, 2009 | 74,528.00 |
| January 26, 2010 | 13,417.00 |
| June 17, 2010 | 51,481.03 |
| July 1, 2010 | 340.00 |
| July 1, 2010 | 1,325.63 |
| July 7, 2010 | 874.99 |
| November 29, 2010 | 45,752.00 |
| December 3, 2010 | 25,532.00 |
| January 12, 2011 | 28,263.00 |
| March 4, 2011 | 18,164.00 |
| March 7, 2011 | 30,000.00 |
| April 7, 2011 | 4,234.00 |
| July 1, 2011 | 17,083.33 |

<u>$375,782.48</u>

113.    Additionally, Gorbovitski caused Genometrica to make a $40,000

payment on December 26, 2010, to an entity or person that has not yet been determined.

**C.    Improper Contributions to and Overfunding**
   **of Gorbovitski's 401k Account**

114.    Upon information and belief, Gorbovitski caused Genometrica to overfund

his account under Genometrica's 401K plan (the "401K Plan") through matching funds,

discretionary contributions, and profit sharing that he was not eligible to receive.

115.    Section 4.02(a) of the 401K Plan requires Genometrica to make an annual

"Matching Contribution" on behalf of each employee provided that the employee has

completed at least 1,000 hours of service during the 401K Plan year and is employed by

Genometrica on the last day of the 401K Plan year.

116.    Upon information and belief, Gorbovitski never satisfied the annual

matching-fund requirement of working at least 1,000 hours for Genometrica.

Accordingly, he was not entitled to any matching contribution made by Genometrica and

was entitled only to the contributions that he made directly.

117.    Likewise, according to Genometrica's federal tax return, Genometrica had

no taxable income from 2008 to 2010.  Since Genometrica had no taxable income, it

could not make profit sharing contributions to the 401K Plan.

118.    Set forth below is a summary of the overpayments to Gorbovitski's

account:

| 401K Payment Type | 2008 | 2009 | 2010 |
|---|---|---|---|
| Employer Match | $    0.00 | $    0.00 | $6,175.00 |
| Employer Discretionary | 4,592.48 | 5,317.11 | 0.00 |
| Profit Sharing | 0.00 | 164.41 | 33,000.00 |

$4,592.48   $5,481.52   $39,175.00

### D.     Company Car for Non-Employee Wife

119.     Gorbovitski also took money from Genometrica to finance a car lease ostensibly for himself as a director and executive officer of Genometrica, but which instead was for the benefit of his wife Gorfinkel, who was no longer an employee, director, or shareholder of Genometrica.

120.     On August 26, 2008, Gorbovitski, on behalf of Genometrica and himself (as co-lessees), entered into a motor-vehicle lease agreement with Smithtown Toyota under which Genometrica leased a 2009 Camry for $355.80 per month for three years. Gorbovitski caused Genometrica to agree to make a down payment of $2,460.32 for the car and to make 35 monthly payments totaling $12,808.80, for a total lease expense of $14,913.32.

121.     Upon information and belief, Gorfinkel -- who during the car-lease term held no position with Genometrica -- was the primary driver of this automobile.  As such, the Genometrica-funded lease has never benefited Genometrica, but instead has only benefited non-employee Gorfinkel, who happened to be the wife of Gorbovitski, the sole executive officer and director of Genometrica.

122.     Upon information and belief, Genometrica also paid maintenance, fuel, and insurance costs through Gorbovitski and Gorfinkel's use of Genometrica corporate credit cards and Gorbovitski's use of Genometrica expense reimbursements.

### E.     Payment of Rent to Gorfinkel

123.     In addition, Gorbovitski caused Genometrica to enter into several lease agreements with Gorfinkel to pay her substantial base rent, plus additional expenses, for a

small amount of "office space" with a "sliding door to the patio" in the home that she owned with Gorbovitski.

124.    At the same time, Genometrica rented, for a nominal $100 per month, sufficient office space from the Long Island High Technology Incubator located at 25 Health Sciences Drive, Stony Brook, New York 11790-3350.

125.    Thus, the "office space" that Gorbovitski caused Genometrica to rent from Gorfinkel was unnecessary for Genometrica's needs and merely represented a series of bogus rentals that allowed Gorbovitski and Gorfinkel to pilfer additional funds from Genometrica.

126.    For example, on October 1, 2007, Gorbovitski caused Genometrica to enter into a one-year commercial lease agreement with Gorfinkel for 250 square feet of space in their home located at 29 Sycamore Circle, Stony Brook, New York 11790, at an annual base rent of $14,044 (the "2007 Lease").  Upon a review of Genometrica's checking accounts, $2,449 of the base rent payments have been accounted for thus far for the 2007 Lease.

127.    On October 1, 2008, Gorbovitski, for a second time, caused Genometrica to enter into a one-year commercial lease agreement with Gorfinkel for 250 square feet of space in their home located at 29 Sycamore Circle, Stony Brook, New York 11790, at an annual base rent of $14,044 (the "2008 Lease").  Upon a review of Genometrica's checking accounts, $1,929 of the base rent payments have been accounted for thus far for the 2008 Lease.

128.    On October 1, 2009, Gorbovitski, for a third time, caused Genometrica to enter into a one-year commercial lease agreement with Gorfinkel for 250 square feet of

space in their home located at 29 Sycamore Circle, Stony Brook, New York 11790, at an annual base rent of $14,044 (the "2009 Lease"). Upon a review of Genometrica's checking accounts, $5,032 of the base rent payments have been accounted for thus far for the 2009 Lease.

129.    On December 1, 2010, Gorbovitski, for a fourth time, caused Genometrica to enter into a one-year commercial lease agreement with Gorfinkel this time for 500 square feet of space in their home located at 31 Gaul Road, East Setauket, New York 11733, at an annual base rent of $15,000 (the "2010 Lease"). Upon a review of Genometrica's checking accounts, none of the base rent payments have been accounted for thus far for the 2010 Lease.

130.    Under these four leases, Gorbovitski caused Genometrica also to agree to pay and to pay for certain real estate and personal property taxes, assessments, utilities, repairs, and/or improvements each year. Upon information and belief, Gorfinkel did not prorate any of these expenses based on the percentage of square feet supposedly rented by Genometrica.

131.    In each of these four lease agreements, Gorbovitski caused Genometrica to also give Gorfinkel, upon information and belief, a security deposit of $1,000.

132.    During these four years, according to Genometrica's bank statements Genometrica has paid for, *inter alia*, utilities, lawn care, landscaping, heating oil, cable television, internet service, telephone expenses, and furniture for the properties that Genometrica supposedly rented from Gorfinkel. Upon information and belief, Gorfinkel did not prorate any of these expenses based on the percentage of square feet supposedly rented by Genometrica.

F.     **Payment for Foreign Travel**

133.    Gorbovitski and Gorfinkel also used Genometrica's funds to finance their international travel plans.  For example, in August, September, October and November 2010, Gorbovitski caused Genometrica to pay an aggregate of $11,989 in expenses charged to Genometrica's HSBC MasterCard for a four-month trip that Gorbovitski took to Moscow, Dubai, and Munich.

134.    In addition, in January, April, May, and June 2011, Gorbovitski caused Genometrica to pay an aggregate of $4,522 in expenses charged to Genometrica's HSBC MasterCard for trips that Gorbovitski and/or Gorfinkel took to Moscow, Dubai, and London.

135.    Upon information and belief, Gorbovitski and/or Gorfinkel have family in Moscow and own a home in Dubai.  Further, upon information and belief, neither Gorbovitski nor Gorfinkel had any legitimate Genometrica business purpose for these trips.

G.     **Payments to Consultants**

136.    Between 2008 and 2011, Gorbovitski caused Genometrica to pay more than $300,000 for services allegedly rendered to or for the benefit of Genometrica.  From 2009 through 2011, Genometrica's research was conducted at Stony Brook pursuant to the Research Agreements, and any outside "consultants" were, therefore, unnecessary.

137.    Alternatively, upon information and belief, Gorbovitski caused Genometrica to pay these consulting fees for services rendered for the benefit of ABMM, to funnel money from Genometrica in order to fund ABMM's research with Genometrica's money, and to advance the development of ABMM and the ABMM

Sequencer at the expense and to the detriment of Genometrica.  In fact, ABMM's NIH

Grant Application names as ABMM personnel the following individuals who Gorbovitski

also paid as consultants to Genometrica:  G. Gudkov, A. Stepukhovich, G. Tyshko, D.

Gavrilov and A. Tsupryk.  Any and all technology resulting from the work of these

individuals therefore is the property of Genometrica.

### UNFAIR COMPETITION AND PATENT INFRINGEMENT

138.    After Gorbovitski and Gorfinkel received approximately $1.8 million for

their ownership interest in Genometrica, and while Gorbovitski continued to be the sole

director and executive officer of Genometrica, they embarked on a course of action which

violated and continues to violate their Restrictive Covenants Agreement with

Genometrica, breached Gorbovitski's fiduciary duty to Genometrica, and resulted and

continues to result in unfair competition, by unfairly competing directly with

Genometrica through ABMM.

139.    This course of action included Gorbovitski's formation of ABMM, the

pilfering of Genometrica's intellectual property and confidential information by

Gorbovitski and Gorfinkel, and Gorbovitski's improper use of Genometrica's financial

resources, and then both of them using the same as if they were owned by ABMM, all in

violation of their Restrictive Covenants Agreements, Gorbovitski's fiduciary duties, and

various laws, rules and regulations relating to theft of intellectual property, and patent

infringement.

140.    Gorbovitski formed ABMM on August 11, 2009, while he was still

serving as the sole executive officer and sole director of Genometrica.

141.    Since ABMM's formation, Gorbovitski has been its chairman and/or chief executive officer.

142.    Upon information and belief, Gorfinkel and/or Gorbovitski are ABMM's only shareholders.

143.    ABMM is the owner of all rights title and interest to the domain name, www.advancedbiomedicalmachines.com. Annexed hereto and made a part hereof as **Exhibit 8** is the registration page from www.godaddy.com showing said domain name to be registered to ABMM and that Defendant Gorbovitski is the website's administrator.

144.    ABMM, by and through Defendant Gorbovitski created and purchased said domain name, on or about August 18, 2009, while Gorbovitski was still the President, Treasurer and executive officer of Genometrica.

145.    Upon information and belief, Gorbovitski paid Godaddy for ABMM's website using Genometrica's money.

146.    At some time after the creation and purchase of its domain name www.advancedbiomedicalmachines.com , and in connection thereto, ABMM launched a website.  Annexed hereto and made a part hereof as **Exhibit 7** is a www.web.archive.com screenshot showing the the ABMM website as of February 2, 2011.

147.    For a period of at least from February 2, 2011 through July 4, 2011, ABMM and Gorbovitski used the website www.advancedbiomedicalmachines.com to promote, market, offer to sell and sell an ABMM Single Capillary Automated DNA Sequencer. A picture of the Single Capillary Automated DNA Sequencer purporting to be ABMM's is shown in ABMM's website, a screenshot of which is annexed hereto as **Exhibit 7**.

148.    ABMM's website carries the following copyright notice: "Copyright ©
2009 ABMM Inc."  In addition it carries the following telephone numbers: (631)219-
9335 (office) and (631)751-2457(fax).  Upon information and belief such phone numbers
belong to ABMM.

149.    As a result of the foregoing, ABMM is clearly holding out and
representing to the public in interstate commerce that it is the owner of all rights, title and
interest to the website and the intellectual property contained therein, including the Single
Capillary Automated DNA Sequencer.

150.    However, ABMM's foregoing representations are patently untrue.  A
close inspection of the lower left corner of the pictured Single Capillary Automated DNA
Sequencer clearly shows the name "BioPhotonics" -- Genometrica's former corporate
name.  Further, the image on the ABMM website was taken directly from a 2005
BioPhotonics brochure prepared under the auspices of Gorbovitski as Genometrica's sole
executive officer.

151.    Genometrica never authorized or granted permission to ABMM to
promote, market, advertize, offer to sell and sell Genometrica's Single Capillary
Automated DNA Sequencer; or a Single Capillary Automated DNA Sequencer bearing
Genometrica's BIOPHOTONICS name, or any simulation, reproduction, copy,
counterfeit or colorable imitation thereof.

152.    ABMM did so intentionally and willfully for the purpose of trading on the
goodwill associated with Genometrica's Single Capillary Automated DNA Sequencer,
Genometrica's research in connection thereto, or Genometrica's BIOPHOTONICS name
associated therewith.

153.     Alternatively, ABMM did so intentionally and willfully for the purpose of diluting the goodwill associated with Genometrica's Single Capillary Automated DNA Sequencer, Genometrica's Research in connection thereto, or Genometrica's BIOPHOTONICS name associated therewith; or interfering in Genometrica's future business relationships.

154.     Upon information and belief, and in further promotion of the alleged ABMM Single Capillary Automated DNA Sequencer, ABMM by and through Gorbivitski prepared and posted a general profile statement to the website www.inknowvation.com, which reads as as follows:

> Advanced BioMedical Machines Inc. (ABMM) has implemented several technical advances in fluorescent detection technology developed in the past years by our research group at SUNY Stony Brook.  This technology is based on multicolor laser excitation and single photon counting and offers an extremely sensitive detection of minute amounts of fluorescent material (down to single fluorescence molecules).   These elements underlie a successful research and development program that has been pursued at SUNYSB.   Advanced BioMedical Machines Inc. (ABMM) licensed the technology from the SUNY Research Foundation and is actively pursuing its development in the Long Island High Technology Incubator.  Additional patents have been filed since 1996, reflecting additional innovations.   The Stony Brook technology has received wide recognition at the National Institutes of Health.  During the last four years, two NIH institutes, the National Human Genomic Research Institute and the National Cancer Institute, provided about $8Million of federal funding in four distinct but complementary projects.  These projects addressed and successfully tested all of the principal design issues.  The unique features of the ABMM sequencer, its exceptional sensitivity, dynamic range, compact size, and convenient modular design have attracted the attention of molecular biologists and geneticists, not only at Stony Brook University but also at the Cold Spring Harbor Laboratory, the Memorial Sloan-Kettering Cancer Center and the Brookhaven National

Laboratory.  Recently, we demonstrated our instrument at the Suffolk Police Medical Center, and are currently performing tests of genetic identity DNA samples for forensic use.

155.    Genometrica's General Profile Statement, as it appears in

www.inknowvation.com, states as follows:

[Genometrica] is involved in DNA sequencing instruments. [Genometrica] has implemented several technical advances in fluorescent detection technology developed in the past years by our research group at SUNY Stony Brook.  This technology is based on multicolor laser excitation and single photon counting and offers an extremely sensitive detection of minute amounts of fluorescent material (down to single fluorescence molecules).  These elements underlie a successful research and development program that has been pursued at SUNYSB.  [Genometrica] licensed the technology from the SUNY Research Foundation and is actively pursuing its development in the Long Island High Technology Incubator.

156.    Upon information and belief, Gorbovitski also drafted Genometrica's

General Profile Statement.

157.    A side by side comparison of the ABMM and Genometrica General

Profile Statements, as they appear in www.inknowvation.com, reveals the following

similarities:

| ABMM | GENOMETRICA |
|---|---|
| has implemented several technical advances in fluorescent detection technology developed in the past years by our research group at SUNY Stony Brook. | has implemented several technical advances in fluorescent detection technology developed in the past years by our research group at SUNY Stony Brook. |
| This technology is based on multicolor laser excitation and single | This technology is based on multicolor laser excitation and single |

| | |
|---|---|
| photon counting and offers an extremely sensitive detection of minute amounts of fluorescent material (down to single fluorescence molecules). | photon counting and offers an extremely sensitive detection of minute amounts of fluorescent material (down to single fluorescence molecules). |
| These elements underlie a successful research and development program that has been pursued at SUNYSB. | These elements underlie a successful research and development program that has been pursued at SUNYSB. |
| Advanced BioMedical Machines Inc. (ABMM) | [Genometrica] |
| licensed the technology from the SUNY Research Foundation and is actively pursuing its development in the Long Island High Technology Incubator. | licensed the technology from the SUNY Research Foundation and is actively pursuing its development in the Long Island High Technology Incubator. |

158.    It is clear from the foregoing that ABMM's General Business Profile is identical to Genometrica's.  Further, the only reason that ABMM's General Business Profile is identical to Genometrica's is because Gorbovitski wanted ABMM to trade on and benefit from Genometrica's goodwill and reputation in the DNA Sequencer technology.

159.    In fact, in a little more than two years since ABMM's formation in August 2009, Gorbovitski and Gorfinkel have transformed ABMM from a corporate shell into a direct competitor of Genometrica within a highly-complex, cutting-edge, scientific industry, developing and commercializing a sophisticated biomedical device and

technology that is substantially similar or identical to, based on, or the second generation-model of Genometrica's Medical Device.

160.    It is also abundantly clear from the foregoing that Gorbovitski and ABMM, with assistance from Gorfinkel, have developed in two years what it took Genometrica 15 years to develop, by stealing and using Genometrica's intellectual property and confidential information.

161.    It is also clear from the foregoing that Gorbovitski and ABMM, with assistance from Gorfinkel, are misrepresenting to the public in commerce, the nature, characteristics, and qualities of ABMM's device, research, and technology by palming off Genometrica's intellectual property and Medical Device as their own.

162.    In other words, by misappropriating Genometrica's intellectual property, Gorbovitski, Gorfinkel and ABMM have unfairly and improperly leapfrogged past Genometrica's 15 years of painstaking and expensive research and are reaping the benefits of what it has not sown.

163.    Gorbovitski and Gorfinkel, through their wrongful theft of the intellectual property and other assets of Genometrica, have allowed ABMM to jump straight into the market in direct, unfair competition with Genometrica, with both companies either at essentially the same state of development or with ABMM ahead in the development of a second-generation product.

164.    ABMM's unfair competition with Genometrica further included and still includes competition for funds from, *inter alia*, the NIH.

165.    From 1999 through 2007, and while he was still with Genometrica, Gorbovitski made eight grant applications to the NIH on behalf of Genometrica; and

Genometrica was awarded an aggregate amount of approximately $2 million with which to conduct the very specific and complex biomedical research that was needed to commence and advance the development of the technology underlying Genometrica's Medical Device.

166.    The following is an excerpt from www.projectreporter.nih.gov showing all eight grants that Gorbovitski secured on behalf of Genometrica:

| 5R44CA080599-03 | COLOR DNA SEQUENCING APPARATUS FOR CLINICAL DIAGNOSIS | GORBOVITSKI, BORIS | BIOPHOTONICS CORPORATION | 2001 | NCI | NCI | $439,469 |
|---|---|---|---|---|---|---|---|
| 4R44CA080599-02 | COLOR DNA SEQUENCING APPARATUS FOR CLINICAL DIAGNOSIS | GORBOVITSKI, BORIS | BIOPHOTONICS CORPORATION | 2000 | NCI | NCI | $448,067 |
| 1R44CA080599-01 | COLOR DNA SEQUENCING APPARATUS FOR CLINICAL DIAGNOSIS | GORBOVITSKI, BORIS | BIOPHOTONICS CORPORATION | 1999 | NCI | NCI | |
| 5R42CA106193-04 | DATA ACQUISITION SYSTEM FOR NONINVASIVE CANCER DETECTION | GORBOVITSKI, BORIS | BIOPHOTONICS CORPORATION | 2007 | NCI | NCI | $280,988 |
| 5R42CA106193-03 | DATA ACQUISITION SYSTEM FOR NONINVASIVE CANCER DETECTION | GORBOVITSKI, BORIS | BIOPHOTONICS CORPORATION | 2006 | NCI | NCI | $371,556 |
| 4R42CA106193-02 | DATA ACQUISITION SYSTEM FOR NONINVASIVE CANCER DETECTION | GORBOVITSKI, BORIS | BIOPHOTONICS CORPORATION | 2005 | NCI | NCI | $303,362 |

| 1R42CA106193-01 | DATA ACQUISITION SYSTEM FOR NONINVASIVE CANCER DETECTION | GORBOVITSKI, BORIS | BIOPHOTONICS CORPORATION | 2004 | NCI | NCI | $96,386 |
|---|---|---|---|---|---|---|---|
| 1R43CA113188-01 | NANOLITER SCALE REAL-TIME PCR/CE FOR CANCER DETECTION | GORBOVITSKI, BORIS | BIOPHOTONICS CORPORATION | 2005 | NCI | NCI | $99,945 |

167.    These eight grant applications establish unequivocally that Gorbovitski actively advocated, sought, and successfully obtained, from the NIH funding for Genometrica's research and development efforts before Gorbovitski and Gorfinkel sold their interest in Genometrica.

168.    However, after the July 2008 sale of Genometrica to Invar, but while Gorbovitski still was Genometrica's sole director and sole executive officer, Gorbovitski disregarded his prior funding successes for Genometrica as well as his continuing fiduciary obligations to Genometrica. He also ignored opportunities to obtain further NIH grant money for Genometrica.

169.    Instead, while still serving as the sole executive officer and director of Genometrica, Gorbovitski began seeking NIH grant money in the name and on behalf of ABMM.

170.    Gorbovitski prepared, and on September 24, 2008 submitted in the name of ABMM, an initial grant application to the NIH requesting funding over four years with which to conduct very specific, complex biomedical research that was substantially similar or identical to, based on or a natural progression/next generation of Genometrica's Medical Device research under Gorfinkel's supervision and investigation.

171. In August 2009 the NIH awarded ABMM its first grant. Further the NIH has funded such grant for three years, for a total of $1,673,851.

172. A breakdown of the grant that resulted from Gorbovitski's efforts on behalf of ABMM is set forth as follows:

| 5R42CA140109-03 | DATA ACQUISITION SYSTEM FOR MULTIPLEX ANALYSIS OF COLOR CODED PARTICLES | GORBOVITSKI, BORIS | ADVANCED BIOMEDICAL MACHINES, INC. | 2011 | NCI | NCI | $778,161 |
|---|---|---|---|---|---|---|---|
| 4R42CA140109-02 | DATA ACQUISITION SYSTEM FOR MULTIPLEX ANALYSIS OF COLOR ENCODED PARTICLES | GORBOVITSKI, BORIS | ADVANCED BIOMEDICAL MACHINES, INC. | 2010 | NCI | NCI | $795,459 |
| 1R42CA140109-01 | DATA ACQUISITION SYSTEM FOR MULTIPLEX ANALYSIS OF COLOR ENCODED PARTICLES | GORBOVITSKI, BORIS | ADVANCED BIOMEDICAL MACHINES, INC. | 2009 | NCI | NCI | $100,231 |

173. In preparing and submitting the grant application on behalf of ABMM, Gorbovitski misappropriated, used without authorization and misrepresented Genometrica's confidential information and technologies as ABMM's, despite the obvious conflict of interest with his fiduciary duties to Genometrica as its sole executive officer and sole director.

174. One way that Gorbovitski used Genometrica's information was in ABMM's NIH grant application project title, *i.e.*, "*Data Acquisition System for Multiplex Analysis of Color Encoded Particles*."

175. Upon information and belief, Gorbovitski created this ABMM project title from the name of the technology the Foundation had licensed exclusively to Genometrica known as "Automated DNA Sequencing Data Acquisition," and from the Genometrica research projects.

176. Specifically, Genometrica's current and previous Research Agreements with the Foundation were for two projects entitled "*Development of Automated System for Detection and Recognition of Encoded Beads*" (RF# 44531) and "*Development of the Instrument for Detection and Recognition of color-Encoded Beads*" (RF# 51105), and Genometrica agreed to undertake for Invar (under their March 2008 agreement) "*Development of Technology for Sequential Color Encoding of Large Sets of Micro-Beads*," and "*The Development of the Data Acquisition System for Ultra-Fast and Highly Accurate Detection, Recording, Data Processing and Recognition of Color Encoded Beads.*" Gorbovitski incorporated both  project titles in the ABMM project, in ABMM's NIH grant application.

177. ABMM's "borrowings" from Genometrica do not end there. Another way that Gorbovitski used Genometrica's proprietary information is as follows:

178. ABMM's Phase 1 and 2 Abstract Statements in connection with its project "*Data Acquisition System for Multiplex Analysis of Color Encoded Particles,*" as it appears in www.inknowvation.com, which upon information and belief Gorbovitski and/or ABMM prepared and posted to that website, partially state as follows:

The main goal of this project is a development of the high throughput data acquisition system based on single photon spectrometer which enables detection and highly accurate recognition of sets containing millions of stochastically encoded microparticles and the validation of this system using genome-wide copy number analysis as a model system.

179. A comparison of the foregoing ABMM partial abstract to the research projects embodied in Genometrica's Research Agreements with the Foundation shows that the similarities between ABMM's project and Genometrica's projects go even further than the project names.  A comparison of ABMM's project "*Data Acquisition System for Multiplex Analysis of Color Encoded Particles*" to one of  Genometrica's 2008 research projects reveals the following additional relevant and material similarities between ABMM's and Genometrica's projects:

Comparison of ABMM'S Publicly Available Abstract to
The Work Plan In The First Amendment to Genometrica's
<u>Research Agreement With The Research Foundation</u>

| ABMM'S PHASES 1 & 2 ABSTRACTS | GENOMETRICA'S PLANS FOR THE USE OF THE TECHNOLOGY UNDER ITS JULY 1, 1999 LICENSE AGREEMENT WITH THE RESEARCH FOUNDATION |
|---|---|
| The main goal of this project is:<br>1) a development of the high throughput data acquisition system<br>2) based on single photon spectrometer<br>3) which enables detection and highly accurate recognition of sets containing millions of stochastically encoded microparticles<br>4) and the validation of this system using genome-wide copy number analysis as a model system. | On or about December 9, 2008, Genometrica and the Research Foundation agreed to amend their May 8, 2008 Research Agreement by and through Gorfinkel by agreeing to continue to conduct and carry out in a professional and competent manner all of the work and services required to complete the PROJECT under the Direction of Gorfinkel. The title of the Project in the amendment was entitled "Development of automated system for detection and recognition of encoded beads".<br><br>The Project Period was set out to be 01/01/2009-08/31/2009. |

The project is characterized by only 1 Task.

The Task involved the development of the data acquisition system for ultra-fast and highly accurate detection, recording, data processing and recognition of color encoded beads which included the following steps:

Step No. 1: developing a 32-channel single photon spectrometer with 108 c/s dynamic range and 1 MHz frame rate, by developing, fabricating, and testing a32-channel, 2.4 Ghz bandwidth pulse amplifier with fast 8Bit PECL photon counters based on SiPMS;

developing of data recording system (hardware and software) for 32-channel spectrometer via USB port providing 32 MB/s data recording data recording rate (1MHz frame rate);

developing of technical drawings and fabrication of the spectrometer module;

testing of 3 single photon spectrometers and demonstration thereof; and preparing technical documentation of spectrometer (drawing, circuits, GERBER files, description bill of materials, of software, codes, installation version of spectrometer's software.  And

Step No. 2: developing of an automated data processing software for 32-channel single photon spectrometer.

And Step No. 3: developing a single-capillary programmable optical/fluidic system for pumping and detection of beads at speed up to 104/s.

180.    Consequently, Gorbovitski, Gorfinkel and ABMM have been and are

using Genometrica's intellectual property.  Their wrongful use goes beyond just

ABMM's moving ahead of its competitors without conducting its own initial research.

ABMM, Gorbovitski and Gorfinkel also benefited, based on Genometrica's intellectual property, from the above-listed substantial NIH grants, which are described in more detail below.

181. For example, on or about September 8, 2009, ABMM was awarded NIH Grant #1R42CA140109-01 for $100,231 based upon its misappropriation of Genometrica's intellectual property. The grant ran from September 8, 2009 through June 30, 2010, and Gorbovitski was named principal investigator.

182. Likewise, on or about August 10, 2010, ABMM received NIH Grant #4R42CA140109-02, which provided funding of $795,459 for this same project through June 30, 2011; and on or about August 2011, it received NIH Grant #5R42CA140109-03, which again provided funding of $778,161 for this same project through June 30, 2012.

183. In total, the NIH awarded ABMM approximately $1.7 million for the subject project. These monies funded ABMM's research based on Genometrica's intellectual property -- all while ABMM's research competed with that of Genometrica's, which was concurrently conducted under Gorfinkel's supervision.

184. Upon information and belief, the NIH grants awarded to ABMM were based on ABMM's and Gorbovitski's fraudulent representations to the NIH regarding ABMM's alleged ownership of and/or right to use Genometrica's intellectual property and/or that ABMM is the same entity as Genometrica or is Genometrica's successor or transferee.

185. The ABMM research project described in the NIH Grant Application is a logical continuation of Genometrica's research and development plan for the Genometrica Medical Device.

186.     On information and belief, Gorbovitski as the sole executive officer of Genometrica, and Gorfinkel as the PI/PD under Genometrica's relevant Research Agreements with the Foundation, began conceptualizing, planning and/or preparing for Genometrica an NIH grant application substantially identical to the one actually filed by ABMM.  However, after the sale of Genometrica in July 2008 they decided to misappropriate such application from Genometrica and submit it, almost word-for-word, in the name of a corporation they would form, i.e., ABMM, if and when the NIH awarded the grant.

187.     Gorbovitski wrongfully concealed from Genometrica his creation, control and ownership of ABMM; and all his actions taken in the name and on behalf of ABMM breached his fiduciary duties to Genometrica.

188.     The ABMM Grant Application wrongfully incorporates, discloses and describes, and claims for ABMM the right to utilize, practice and exploit, the technology the Foundation licensed exclusively to Genometrica pursuant to the Research and License Agreements as well as Genometrica's confidential information.

189.     In the Grant Application, Gorbovitski wrongfully characterized Genometrica as the transferor and predecessor of ABMM, thereby dishonestly passing off ABMM as a successor to Genometrica which (a) has the right to use and benefit from Genometrica's history and the fruits of the research and development conducted for it by Gorfinkel and the Foundation at Stony Brook pursuant to the Research Agreements and (b) possesses the exclusive legal right to utilize, practice and exploit the patents and other intellectual property which are licensed exclusively to Genometrica pursuant to its Research and License Agreements with the Foundation.

190.     In the Grant Application, on page 1 of the Biographical Sketch for Boris Gobovitski as President of ABMM, Gorbovitski fraudulently misstates his most recent professional experience as follows:  "11/2009 – Transfer to [ABMM]."  [Emphasis Added.]

191.     Under Related Patents, Gorbovitski lists four US patent applications filed and identifies himself as one of the inventors.  However, he failed to state that the inventors assigned their patent rights to the Foundation and that the Foundation exclusively licensed those rights to Genometrica.

192.     In the Biographical Sketch for Gorfinkel, in the descriptions of the issued patents and filed patent applications in which Gorfinkel is a named inventor, Gorbovitski failed to state that the inventors assigned their patent rights to the Foundation and that the Foundation exclusively licensed those rights to Genometrica.

193.     In Section B1, Background, Gorbovitski fraudulently states that ABMM "wishes to apply the very successful multicolor fluorescent detection technique recently developed by our research group at [ABMM and] Stony Brook…."  He also fraudulently states: "During the last several years our [ABMM'S] research group has developed a number of single photon sensors with increased dynamic range and has demonstrated first DNA sequencing instruments possessing an ultra high sensitivity and a large detection dynamic range. For the first time, we [ABMM] describe a novel single photon spectrometer…which is able to detect and identify compositions of multicolor fluorescent species with very high accuracy.  The key component of the spectrometer- 32-channel single photon detector developed by our [ABMM] group is a unique device…"

194.     In the Grant Application Section C. Relevant Experience, Gorbovitski fraudulently stated: "Development and testing of DNA sequencing Systems Based on Single Photon Detection Below we [ABMM] present DNA sequencing instruments (single-lane and multi-lane) based on single photon detection developed by our research group at SUNY Stony Brook…. A detailed description of our single-lane DNA sequencer… [ABMM] We have also developed an engineering prototype of fully automated 32-lane system…including all requisite software tools and data management system."

195.     In the Grant Application subsection entitled DNA Sequencing Experiments, Gorbovitski fraudulently stated: "To date we have carried out more than 3,000 sequencing runs with our single-lane sequencers and more than 3500 sequencing runs with 32-lane machine…"

196.     In the Grant Application subsection entitled Development of single photon detectors, Gorbovitski fraudulently stated:  "We have developed unique circuitry enabling single photon detection in our single and multi-lane DNA sequencers…"

197.     In the Grant Application he also fraudulently stated:  "The most recent achievement of our group in the development of single photon detectors is presented… For the first time we report a single photon detection system with linearity range as high as…  The achieved linearity range is 10 times higher than the linearity of any commercially available single photon detector.  The obtained result is very important for the success of the entire project since it ensures feasibility of one of the key components of the proposed technology…"

198.    In the Grant Application subsection entitled Single photon detectors based on Silicon photomultipliers (SiPM), Gorbovitski fraudulently stated:  "We [ABMM] tested three different SiPMs from two different sources (….Hamamatsu Phonics)…we, for the first time, demonstrated the applicability of all three detectors to DNA sequencing and obtained high quality sequencing data…"

199.    In the Grant Application subsection entitled Measurements of randomly colored beads, Gorbovitski fraudulently stated: "we have carried out measurements of various bead sets…(samples were kindly provided by CrystalPlex Corp…)."

200.    Even after ABMM had been awarded the NIH grant, Gorbovitski continued to make similar fraudulent statements to the NIH.  Gorbovitski's apparent goal was to maintain for the NIH the crucial fiction that ABMM was Genometrica's successor and as such ABMM had the right to exploit the patent rights the Foundation had licensed exclusively to Genometrica.

201.    Stating he wished to clarify some issues related to ABMM's NIH grant, by letter dated June 28, 2010 Gorbovitski gave the NIH another fraudulent explanation of how ABMM had obtained this grant:  "Initially granted to BioPhotonics Corp. (BPC), in August 2009 this grant was transferred from the BPC to [ABMM].  The reason for the transfer was acquisition of BioPhotonics by a VC (the owner of Genometrica Ltd., Lugano, Switzerland) with the purpose of commercialization of the developed IP portfolio, and transfer of the PI/PD of the project Dr. Boris Gorbovitski, from BioPhotonics to ABMM."  [Emphasis added.]  Letter dated June 28, 2010 from ABMM to Dr. Patricia Weber, Program Director, National Cancer Institute, a copy of which is annexed hereto and made a part hereof as **Exhibit 5**.

202.    Along with its June 28, 2010 letter to the NIH, ABMM delivered to the NIH its Commercialization Plan Update, June 2010.  Such Update contained numerous statements fraudulent describing ABMM as the successor to Genometrica.

203.    In Section 2.1 of the Update, entitled Strategic Overview, Business Mission Statement, Gorbovitski wrote the following:  "ABMM, and its predecessor BioPhotonics Corp., have since 1996 focused on the design and development of innovative molecular diagnostic instrumentation. Proprietary developments in fluorometry have positioned ABMM to address applications commonly served by DNA microarrays and multicolored beads."

204.    In the Update's Section 3, entitled ABMM Technology Platform, Gorbovitski gave the following false statement about ABMM's technology:  "There are 9 patents confirming the privilege position of the technology platform (license for use is owned by our predecessor BioPhotonics Corp. under the License Agreement with Research Foundation of Stony Brook University, NY)."

205.    And again, in Section 4.1.1, entitled Strategic Analysis – Resources and Market Value of the Project – Intellectual Property, Gorbovitski fraudulent told the NIH: "There are 9 patents confirming the privilege position of engineering solutions of ABMM platform (license for the use of patents is owned by ABMM predecessor BioPhotonics Corp. under The License Agreement with Stony Brook University Research Foundation, NY)."

206.    In addition, in preparing this Update, Gorbovitski had misappropriated the contents of the confidential Business Plan of Genometrica. He did so virtually word-for-

word, obtaining such Business Plan from Genometrica under the false pretense that he
wanted to show it to potential investors.

207.    In summary, ABMM was organized as a corporation under Delaware law
in August 2009.  Yet Gorbovitski filed the Grant Application as President of ABMM in
September 2008.  In such Grant Application he referred to numerous tests and
measurements conducted and new and important results obtained and achieved by, and
technologies and techniques developed by, ABMM or its research group.  These activities
of ABMM and its research group never occurred because ABMM did not even legally
exist at the time Gorbovitski filed the Grant Application, and no Stony Brook or
Foundation research group could possibly have done any work for or entered into any
research agreement with ABMM on or before September 2008.

208.    Further, upon information and belief, the NIH grant applications were
prepared and funded at the expense of Genometrica.

209.    With respect to certain patented technology, the Foundation is the owner
by assignment of all right, title and interest in and to the following currently valid U.S.
Patents:

| U.S. PATENT NUMBERS | DATE OF ISSUE | TITLE |
| --- | --- | --- |
| US 7,402,817 B2 | July 22, 2008 | SYSTEM AND METHOD FOR CROSS-TALK CANCELLATION IN A MULTILANE FLURESCENCE DETECTOR |
| US 6,944,407 B2 | September 13, 2005 | METHOD AND APPARATUS FOR DETECTING RADIATION |
| US 6,934,030 B2 | August 23, 2005 | METHOD AND APPARATUS FOR DETECTING RADIATION |
| US 6,771,367 B2 | August 3, 2004 | METHOD AND APPARATUS |

|  |  | FOR DETECTING RADIATION |
|---|---|---|
| US 6,760,109 B2 | July 6, 2004 | METHOD AND APPARATUS FOR DETECTING RADIATION |
| US 6,759,247 B2 | July 6, 2004 | METHOD AND APPARATUS FOR DETECTING RADIATION |
| US 6,528,801 B1 | March 4, 2003 | METHOD AND APPARATUS FOR DETECTING RADIATION |
| US 6,497,804 B1 | December 24, 2002 | METHOD AND APPARATUS FOR DNA SEQUENCING |
| US 6,475,362 | November 5, 2002 | METHOD AND APPARATUS FOR COMPRESSION OF DNA SAMPLES FOR DNA SEQUENCING |
| US 6,464,852 B1 | October 15, 2002 | MULTICAPILLARY BUNDLE FOR ELECTROPHORESIS AND DETECTION FOR DNA |
| US 6,038,023 A3 | March 14, 2000 | SENSORS FOR DETECTION AND SPECTROSCOPY |
| U.S. 5,784,157 | July 21, 1998 | METHOD AND APPARATUS FOR IDENTIFYING FLUROPHORES |

210.    As the owner of all right, title and interest in and to the Patents, the

Foundation has the exclusive authority to prevent others from making, using and selling

the goods and technology which are protected by the foregoing Patents.

211.    The Foundation is the also the owner by assignment of all right, title and

interest in and to the following currently pending U.S. Patent Applications:

| Patent Application No. | Title of Invention |
|---|---|
| 12/734,365 | Single Photon Spectrometer |
| 12/083,407 | Absolute PCR Quantification |
| 12/087,812 | Methods and Devices for Detection and Identification of Encoded Beads |

and Biological Molecules

212.    As noted above, on or about July 1, 1999, the Foundation entered into an exclusive License Agreement with Genometrica pursuant to which it granted Genometrica a worldwide exclusive license to use and practice, *inter alia*, the inventions and technology set forth in and protected under the foregoing patents and patent applications.  That License Agreement is currently in full force and effect.

213.    In addition, the Foundation granted Genometrica the right to bring a patent infringement action at its own expense against infringers of the patents licensed to Genometrica under the License Agreement, and to use the name of the Foundation as a party plaintiff  (**Exhibit 1**, page 7).

214.    Accordingly, if Genometrica decides to prosecute infringers of the patents of which it is a Licensee under the License agreement, it may do so by naming the Foundation as a Party Plaintiff.

215.    Genometrica has incorporated and is currently using all of the Technology covered by the License Agreement -- including the foregoing patents and patent applications -- in its Medical Device marketed under the trademark GenometricaLab.

216.    Gorfinkel and Gorbovitski, as a result of their long-term relationship to Genometrica, are fully knowledgeable of all of the foregoing.  Further, they were jointly and severally named as inventors of the inventions protected by the foregoing patents and patent applications.  Consequently, all Defendants knew, or by the exercise of reasonable care and caution, should have known that the foregoing patents had in fact issued.

217.    Notwithstanding all Defendant's knowledge of the Foundation's patented intellectual property and the exclusive License Agreement between Genometrica and the

Foundation regarding same, all Defendants moved forward with making, using, and offering to sell a device -- the ABMM Sequencer -- and provide services in connection with the ABMM Sequencer, which incorporate the inventions embodied in the patents set forth herein above, and which ABMM Sequencer is strikingly and confusingly similar to the Genometrica's Medical Device.

218.    Defendants have also publicly admitted that their device incorporates all of the elements contained in the aforementioned patents as follows:

> Advanced BioMedical Machines Inc. (ABMM) has implemented several technical advances in fluorescent detection technology developed in the past years by our research group at SUNY Stony Brook. This technology is based on multicolor laser excitation and single photon counting and offers an extremely sensitive detection of minute amounts of fluorescent material (down to single fluorescence molecules). These elements underlie a successful research and development program that has been pursued at SUNYSB. Advanced BioMedical Machines Inc. (ABMM) licensed the technology from the SUNY Research Foundation and is actively pursuing its development in the Long Island High Technology Incubator. Additional patents have been filed since 1996, reflecting additional innovations.

*See* www.inknowvation.com.  (Emphasis added.)  Upon information and belief, Gorbovitski and/or ABMM prepared and posted this information to the website.

219.    Further, as has been set forth herein above, Defendants have also admitted in their NIH grant application that they are making and using all of the technology and inventions protected by the afore mentioned patents.

220.    Upon information and belief, Gorfinkel has used these patented and patent-pending technologies in her research and development efforts on behalf of ABMM

and/or turned over these patented technologies to ABMM for its own use in competing directly with Genometrica.

221.    However, contrary to Defendants' statements, neither the Foundation nor Genometrica have authorized or consented to Defendants' use of their respective patents, intellectual property and confidential information, or any simulation, reproduction, copy, copying, counterfeit or colorable imitation thereof.

222.    Defendants' continued patent infringement and unauthorized use of Genometrica's Medical Device will cause a likelihood of confusion.  Such confusion will cause irreparable injury to Genometrica's goodwill and the reputation in its Medical Device.

223.    Upon information and belief, ABMM could not have prepared and obtained the NIH grants without making use of Genometrica's intellectual property and confidential information, which Gorbovitski and Gorfinkel wrongfully provided to ABMM.

224.    Likewise, upon information and belief, ABMM could not have conducted the research and developed the technology necessary to be competitive with Genometrica in as short a period of time as it has without the use of Genometrica's intellectual property, technology and confidential information, which Gorbovitski and Gorfinkel wrongfully took from Genometrica and provided to ABMM.

225.    ABMM has advertised and held itself out as an experienced biomedical company with patents on file since 1996, despite the fact that ABMM was not incorporated until August 2009.  This advertisement claim is an apparent reference to Genometrica's experience and patents.  It is therefore apparent that ABMM has used the

year that Genometrica was formed and Genometrica's intellectual property not only to

fraudulently secure the NIH grants, but also to falsely advertise on websites and in its

marketing efforts in order to secure both investors and customers in direct competition

with Genometrica.  Moreover, ABMM has used an image of a device developed for and

owned by Genometrica, and taken excerpts from Genometrica's marketing materials, to

promote ABMM.

226.    Upon information and belief, ABMM has widely disseminated this

information in order to target audiences and the general public.  For example, ABMM has

publicly identified a sequencer on its website www.advancedbiomedicalmachines. com,

using an image of a device created for and owned by Genometrica, and has publicly

stated on www.inknowvation.com that its ABMM Sequencer is unique in its "exceptional

sensitivity, dynamic range, compact size, and convenient modular design," that it has

attracted the attention of notable research institutions, and that it has tested the device for

the Suffolk County Police Department.

227.    Based on the foregoing, it is abundantly clear just how much and how

quickly ABMM has benefited from Gorbovitski's and Gorfinkel's theft of Genometrica's

intellectual property and other assets.

## GORFINKEL HAS ATTEMPTED TO EXTORT GENOMETRICA

228.    Since as early as 2008, Gorfinkel has continuously failed to deliver to the Foundation research reports that summarize the results and progress of her work under its Research Agreements with Genometrica, which reports the Foundation is required by such Agreements to deliver to Genometrica.

229.    Further, since at least 2011, Gorfinkel has refused to perform research under Genometrica's current Research Agreement with the Foundation, notwithstanding that she continues to be the Principal Investigator/Project Director.

230.    Upon information and belief, Gorfinkel has been unable or unwilling to perform her research obligations and produce the required reports because she is conducting research on behalf of ABMM in violation of the Restrictive Covenants Agreement that she entered into with Genometrica.

231.    As a result of Gorfinkel's actions, Genometrica has been unable to evaluate the results of the research it has sponsored and funded, obtain new investors, formulate budgets and future research plans, and adequately determine the objectives necessary to continue to develop Genometrica's Medical Device.

232.    Even worse, Gorfinkel has attempted to extort Genometrica.  In fact, Gorfinkel has stated that she will cooperate with Genometrica and will resume performing her obligations under the Research Agreements only if Genometrica agrees to certain outrageous demands for cash payments and an equity stake in Genometrica.  As a basis for her demands for immediate cash compensation, Gorfinkel has informed Genometrica's principals that she has come to enjoy a certain lifestyle on Long Island -- apparently as a result of the funds that she and Gorbovitski stole and/or embezzled from

Genometrica -- and that she needs money so that she does not have to perform tasks such as cooking, cleaning, and yard work.  Gorfinkel also has demanded the immediate assignment and delivery to her of a 10% equity interest in Genometrica, a consulting fee of $250,000 per year, and an ownership interest in any future intellectual property she develops for Genometrica.

233.    Gorfinkel has further demanded, *inter alia*, that Genometrica not assert any claims against either her or Gorbovitski that allege embezzlement, theft of corporate opportunity, or misappropriation of Genometrica's assets and monies.

234.    Lastly, Gorfinkel has demanded a general release from Genometrica in favor of herself and Gorbovitski.

235.    Without guarantees that Genometrica will capitulate to her extortion, Gorfinkel has continued her refusals to perform her obligations under Genometrica's Research Agreements with the Foundation.  Thus, her refusals and extortion are integral parts of the activities by both Gorfinkel and Gorbovitski to steal Genometrica's money, confidential information and intellectual property, and to use Genometrica's money to fund their very comfortable lifestyle.  In addition, Gorfinkel and Gorbovitski used Genometrica's monies to support ABMM's research and development and to propel ABMM into the marketplace with a second-generation biomedical device at the expense and to the detriment of Genometrica.

### FIRST CLAIM FOR RELIEF

### <u>DECLARATORY JUDGMENT</u>
#### (Against ABMM and Gorbovitski)

236.    Genometrica incorporates by reference the allegations contained in paragraphs 1-235 of the First Amended Complaint as though fully set forth herein.

237.    In order resolve this controversy, Genometrica requests that this Court declare the respective rights and duties of the parties in this matter and, in particular, that this Court declare the extent of Genometrica's property rights in, *inter alia*, intellectual property, inventions, and other assets over which ABMM maintains actual or constructive possession.

238.    Genometrica needs this determination to resolve the current dispute concerning the extent of property interests.

239.    By reason of the foregoing, Genometrica is entitled to declaratory judgment.

## SECOND CLAIM FOR RELIEF

### PATENT INFRINGEMENT UNDER 35 U.S.C. § 271 *et seq*.
**(Against All Defendants)**

240.    Genometrica incorporates by reference the allegations contained in paragraphs 1-239 of the First Amended Complaint as though fully set forth herein.

241.    Defendants' acts of making, using, offering to sell and selling their Medical Device constitute willful infringement under 35 U.S.C. § 271 and §§ 281 - 285 of the Foundation's U.S. Patent Nos. 7,402,817 B2; 6,944,407 B2; 6,934,030 B2; 6,771,367 B2; 6,760,109 B2; 6,759,247 B2; 6,528,801 B1; 6,497,804 B1; 6,475,362; 6,464,852 B1; 6,038,023 A3; and 5,784,157, as exclusively licensed to Genometrica.

242.    Defendants have actual notice of the infringement of patents 7,402,817 B2;  6,944,407 B2; 6,934,030 B2; 6,771,367 B2; 6,760,109 B2; 6,759,247 B2; 6,528,801 B1; 6,497,804 B1; 6,475,362; 6,464,852 B1; 6,038,023 A3; and 5,784,157.

243.    Defendants' actions have caused irreparable injury to Genometrica's business and business reputation, for which injury, as Defendants Gorbovitski and

Gorfinkel have agreed in their Restrictive Covenants Agreements, there is no adequate remedy at law.

244.    Defendants will continue to infringe the patents, *i.e.*, 7,402,817 B2, 6,944,407 B2, 6,934,030 B2, 6,771,367 B2, 6,760,109 B2, 6,759,247 B2, 6,528,801 B1, 6,497,804 B1, 6,475,362, 6,464,852 B1, 6,038,023 A3, and 5,784,157 by their continued manufacture, use, sale, and offers to sell their ABMM Sequencer unless enjoined by this Court.

245.    Defendants' actions will continue to harm Genometrica and the Foundation in that said actions will continue to damage Genometrica's business and business reputation in a manner not adequately compensable by law.

246.    Defendants' actions have harmed Genometrica's business in that Genometrica has lost sales and suffered monetary damage, the amount of which is yet undetermined.

247.    Defendants have caused and a likely to continue to cause substantial injury to the public and to Genometrica; and therefore Genometrica is entitled to injunctive relief and also to recover Defendants' profits, actual damages, enhanced profits and damages, as well as to recover Genometrica's costs and reasonable attorneys' fees.

248.    Genometrica has the right to bring the present patent infringement claims at its own expense against infringers of the patents licensed to Genometrica under the License Agreement, and to use the name of the Foundation as a party plaintiff (**Exhibit 1**, page 7).

### THIRD CLAIM FOR RELIEF

### FEDERAL UNFAIR COMPETITION
### Pursuant to 15 U.S.C. § 1125(a)(1)(A)
### <u>FALSE DESIGNATION OF ORIGIN</u>
### (Against All Defendants)

249.     Genometrica incorporates by reference the allegations contained in paragraphs 1 - 248 of the First Amended Complaint as though fully set forth herein.

250.     The conduct of Defendants as described herein, including their current and former use, marketing, offer to sell and sale of the ABMM Sequencer, constitutes federal unfair competition because it falsely designates the origin as to the affiliation, connection, and association between such device and Genometrica's Medical Device, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

251.     As an actual and proximate result of Defendants' willful and intentional actions and Defendants' conspiracy, Genometrica has suffered damages through various means including, but not limited to, (i) loss of potential customers and/or entities that work with or have an interest in purchasing and/or investing in Genometrica's Medical Device, (ii) loss of NIH grants, (iii) harm to Genometrica's reputation, (iv) wastage of Genometrica's investment in time, effort, and money, (v) loss of further development of Genometrica's Medical Device and second generation technology, (vi) loss of Genometrica's goodwill, and (v) confusion with ABMM.

252.     Genometrica is entitled to damages for Defendants' violations and conspiracy, recovery of profits earned by ABMM, from the ABMM Sequencer, and recovery of costs in this action.  Furthermore, Defendant's conduct was undertaken willfully and with the intention of causing confusion, mistake, or deception, making this an exceptional case entitling Genometrica to recover additional damages and reasonable

attorneys' fees.

253.    As a direct and proximate result of Defendants' wrongful conduct, and as agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements, Defendants have caused Genometrica irreparable harm and injury.

254.    Defendants acts of infringement and unfair competition are and at all times were knowing and willful.

255.    Unless Defendants are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**

**FEDERAL UNFAIR COMPETITION**
**Pursuant to 15 U.S.C. § 1125(a)(1)(A)**
**CONFUSION, MISTAKE AND/OR DECEPTION**
**(Against All Defendants)**

256.    Genometrica incorporates by reference the allegations contained in paragraphs 1-255 of the First Amended Complaint as though fully set forth herein.

257.    The conduct of Defendants as described herein, including their current use, marketing, offer to sell, and sale of the ABMM Sequencer constitutes federal unfair competition because it causes the likelihood of confusion, mistake and/or deception as to the affiliation, connection, and association between Defendants' ABMM Sequencer and Genometrica's Medical Device, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

258.    As an actual and proximate result of Defendants' willful and intentional actions and Defendants' conspiracy, Genometrica has suffered damages through various means including, but not limited to, (i) loss of potential customers and/or entities that

work with or have an interest in purchasing and/or investing in Genometrica's Medical Device, (ii) loss of NIH grants, (iii) harm to Genometrica's reputation, (iv) wastage of Genometrica's investment in time, effort, and money, (v) loss of further development of Genometrica's Medical Device and second generation technology, (vi) loss of Genometrica's goodwill, and (v) confusion with ABMM.

259.    Genometrica is entitled to damages for Defendants' violations and conspiracy, recovery of profits earned by ABMM from the ABMM Sequencer, and recovery of costs in this action.  Furthermore, ABMM's conduct was undertaken willfully and with the intention of causing confusion, mistake, or deception, making this an exceptional case entitling Genometrica to recover additional damages and reasonable attorneys' fees.

260.    As a direct and proximate result of Defendants' wrongful conduct, and as agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements, Defendants have caused Genometrica irreparable harm and injury.

261.    Defendants' acts of infringement and unfair competition are knowing and willful.

262.    Unless Defendants are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which they have no adequate remedy at law.

263.    Pursuant to 15 U.S.C. §§ 1116 and 1117, Genometrica is entitled to injunctive relief to prevent the violation of its rights.

**FIFTH CLAIM FOR RELIEF**

**FEDERAL UNFAIR COMPETITION**
**Pursuant to 15 U.S.C. § 1125(a)(1)(B)**
**MISREPRESENTATION OF NATURE,**
**CHARACTERISTICS, QUALITIES OR ORIGIN**
**(Against All Defendants)**

264.    Genometrica incorporates by reference the allegations contained in

paragraphs 1-263 of the First Amended Complaint as though fully set forth herein.

265.    The conduct of Defendants as described herein, including their current

use, marketing, offer to sell, and sale of the ABMM Sequencer, constitutes federal unfair

competition because it misrepresents the nature, characteristics, qualities or origin of

Defendants' ABMM Sequencer in violation of Section 43(a) of the Lanham Act, 15

U.S.C. § 1125(a)(1)(B).

266.    As an actual and proximate result of Defendants' willful and intentional

actions and Defendants' conspiracy, Genometrica has suffered damages through various

means including, but not limited to, (i) loss of potential customers and/or entities that

work with or have an interest in purchasing and/or investing in Genometrica's Medical

Device, (ii) loss of NIH grants, (iii) harm to Genometrica's reputation, (iv) wastage of

Genometrica's investment in time, effort, and money, (v) loss of further development of

Genometrica's Medical Device and second generation technology, and (vi) loss of

Genometrica's goodwill.

267.    Genometrica is entitled to damages for Defendants' violations and

conspiracy, recovery of profits earned by ABMM from the ABMM Sequencer, and

recovery of costs in this action.  Furthermore, ABMM's conduct was undertaken willfully

and with the intention of causing confusion, mistake, or deception, making this an exceptional case entitling Genometrica to recover additional damages and reasonable attorneys' fees.

268.    As a direct and proximate result of Defendants' wrongful conduct, and as agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements, Defendants have caused Genometrica irreparable harm and injury.

269.    Defendants' acts of unfair competition are knowing and willful.

270.    Unless Defendants are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

271.    Pursuant to 15 U.S.C. §§ 1116 and 1117, Genometrica is entitled to injunctive relief to prevent the violation of its rights.

## SIXTH CLAIM FOR RELIEF

## DECEPTIVE BUSINESS PRACTICES IN CONTRAVENTION
## OF NEW YORK GENERAL BUSINESS LAW § 349
### (Against All Defendants)

272.    Genometrica incorporates by reference the allegations contained in

paragraphs 1-271 of the First Amended Complaint as though fully set forth herein.

273.    Defendants' conduct, as described herein comprises or constitutes at least

one deceptive business practice, as defined by and in contravention of New York General

Business Law § 349.

274.    As an actual and proximate result of Defendants' willful and intentional

actions and Defendants' conspiracy, Genometrica has suffered damages through various

means including, but not limited to, (i) loss of potential customers and/or entities that

work with or have an interest in purchasing and/or investing in Genometrica's Medical

Device, (ii) loss of NIH grants, (iii) harm to Genometrica's reputation, (iv) wastage of

Genometrica's investment in time, effort, and money, (v) loss of further development of

Genometrica's Medical Device and second generation technology, (vi) loss of

Genometrica's goodwill, and (v) confusion with ABMM.

275.    As a result of the foregoing, Genometrica is entitled to an award of

compensatory, consequential, and punitive damages for malicious and wanton conduct

based upon the past and continuing violation of New York General Business Law § 349.

Further, Defendants should be directed to immediately account for all monies earned as a

result of their aforementioned violation of New York General Business Law § 349.

276.    As a direct and proximate result of Defendants' wrongful conduct, and as

agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements,

Defendants have caused Genometrica irreparable harm and injury.

277.    Defendants acts in violation of New York General Business Law § 349 are knowing and willful.

278.    Unless Defendants are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

**SEVENTH CLAIM FOR RELIEF**

**VIOLATION OF NEW YORK STATE**
**<u>UNFAIR COMPETITION LAWS</u>**
**(Against All Defendants)**

279.    Genometrica incorporates by reference the allegations contained in paragraphs 1-278 of the First Amended Complaint as though fully set forth herein.

280.    Defendants' conduct, as described herein, constitutes infringement pursuant to New York State Common Law and New York State Law of Unfair Competition as defined by and in contravention of New York statutes and case law.

281.    As an actual and proximate result of Defendants' willful and intentional actions and Defendants' conspiracy, Genometrica has suffered damages through various means including, but not limited to, (i) loss of potential customers and/or entities that work with or have an interest in purchasing and/or investing in Genometrica's Medical Device, (ii) loss of NIH grants, (iii) harm to Genometrica's reputation, (iv) wastage of Genometrica's investment in time, effort, and money, (v) loss of further development of Genometrica's Medical Device and second generation technology, (vi) loss of Genometrica's goodwill, and (v) confusion with ABMM.

282.    As a result of the foregoing, Genometrica is entitled to an award of

compensatory, consequential, and punitive damages for malicious and wanton conduct based upon the past and continuing unfair competition.  Further, Defendants should be directed to immediately account for all monies earned as a result of their aforementioned unfair competition.

283.    As a direct and proximate result of Defendants' wrongful conduct, and as agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements, Defendants have caused Genometrica irreparable harm and injury.

284.    Defendants' acts of infringement and unfair competition are knowing and willful.

285.    Unless Defendants are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

### EIGHTH CLAIM FOR RELIEF

### MISAPPROPRIATION OF TRADE SECRETS
#### (Against All Defendants)

286.    Genometrica incorporates by reference the allegations contained in paragraphs 1-285 of the First Amended Complaint as though fully set forth herein.

287.    Other than the intellectual property that has been heretofore published, Genometrica's Medical Device comprises intellectual property that constitutes trade secrets under New York law because it consists of, *inter alia*, a formula, pattern, compilation, program device, method, technique, or process from which (a) Genometrica derives economic value by there not being generally known to the public or others who can obtain economic value from their disclosure or use, (b) Genometrica has attempted contractually and otherwise to maintain the secrecy of its intellectual property and its

Medical Device amongst a select group of chosen associates, (c) Genometrica has spent

millions of dollars developing and is still developing its intellectual property and its

Medical Device, and (d) such intellectual property and Medical Device are not otherwise

publicly available or easily duplicated.

288.   Gorbovitski and Gorfinkel, by reason of contractual obligation under the

Restrictive Covenants Agreements, the Research Agreements, and/or the License

Agreement, had a duty to protect Genometrica's trade secrets.

289.   Defendants, by reason of their fiduciary and/or affiliate relationship with

Genometrica, had a duty to protect Genometrica's trade secrets.

290.   Gorbovitski, Gorfinkel, and ABMM have acquired Genometrica's trade

secrets through improper means, and by conspiracy with each other.

291.   Defendants have wrongfully used and/or misappropriated Genometrica's

trade secrets in breach of Gorbovitski and Gorfinkel's duty and/or as a result of discovery

by improper means for their own financial gain.

292.   Defendants have used Genometrica's trade secrets to enable ABMM to

take over all or some of what would be Genometrica's market share in the genetic

analysis and sequencing industry.

293.   Defendants intend to use or have used Genometrica's trade secrets to

unfairly deprive Genometrica of its expected position in the genetic analysis and

sequencing industry.

294.   As an actual and proximate result of Defendants' willful and intentional

actions and Defendants' conspiracy, Genometrica has suffered damages through various

means including, but not limited to, (i) loss of potential customers and/or entities that

work with or have an interest in purchasing and/or investing in Genometrica's Medical Device, (ii) loss of NIH grants, (iii) harm to Genometrica's reputation, (iv) wastage of Genometrica's investment in time, effort, and money, (v) loss of further development of Genometrica's Medical Device and second generation technology, and (vi) loss of Genometrica's goodwill.

295.    As a result of the foregoing, Genometrica is entitled to an award of compensatory, consequential, and punitive damages for malicious and wanton conduct based upon all Defendants' past and continuing misappropriation of trade secrets. Further, Defendants should be directed to immediately account for all monies earned as a result of their aforementioned misappropriation of trade secrets and disgorge same.

296.    As a direct and proximate result of Defendants' wrongful conduct, and as agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements, Defendants have caused Genometrica irreparable harm and injury.

297.    Defendants' acts are knowing and willful.

298.    Unless Defendants are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

### NINTH CLAIM FOR RELIEF

### EMBEZZLEMENT
**(Against All Defendants)**

299.    Genometrica incorporates by reference the allegations contained in paragraphs 1-298 of the First Amended Complaint as though fully set forth herein.

300.     Genometrica is the owner or rightful, exclusive licensee of the intellectual property practiced in the Genometrica Medical Device, and it also is the owner of the financial assets and the Genometrica Medical Device described herein.

301.     As a result of their relationship with Genometrica, Gorbovitski and Gorfinkel had actual or constructive possession of and/or access to Genometrica's intellectual property, financial assets, and Medical Device for more than 10 years.

302.     At various times Gorbovitski and Gorfinkel have been officers, directors, employees or agents of, and/or have been in a contractual relationship with, Genometrica such that they were in a position of trust and owed a duty to Genometrica not to embezzle its intellectual property, financial assets, and Medical Device.

303.     Over a period of at least three years, Gorbovitski and Gorfinkel have exhibited a fraudulent intent to deprive Genometrica of its intellectual property, financial assets, and Medical Device by willfully and corruptly embezzling that property for purposes that were of no benefit to Genometrica.

304.     Gorbovitski, Gorfinkel, and ABMM engaged in a conspiracy of fraudulent intent to deprive Genometrica of its intellectual property, financial assets, and Medical Device and benefited from the receipt and/or use of Genometrica's property.

305.     Gorbovitski, as sole executive officer and director of Genometrica during all relevant times, and without authorization, took and directed Genometrica's funds for the personal use and benefit of himself and/or Gorfinkel.

306.     Gorbovitski, as sole executive officer and director of Genometrica during all relevant times, and without authorization, took and directed Genometrica's funds for the use and benefit of and with the knowledge of the other Defendants.

307.     Such uses included, *inter alia*, expenditures for real estate taxes on Gorbovitski and Gorfinkel's residence, rent to Gorfinkel for office space in their home, household furniture, household maintenance, pool and lawn maintenance, food and liquor, personal credit card use, personal non-business-related foreign travel, salary and expenses in excess of reasonable standards, payments to persons not involved in Genometrica's business some of whom were involved in the development of the ABMM Sequencer.

308.     Except for $16,351.78 paid in April 2011, Gorbovitski and Gorfinkel have not returned such funds despite Genometrica's demand that the unauthorized amounts be accounted for.

309.     Defendants intentionally and wrongfully embezzled Genometrica's intellectual property, financial assets, and elements of its Medical Device by unlawfully retaining and exercising dominion over them despite their knowing of Genometrica's claim to its intellectual property, financial assets, and elements of its Medical Device.

310.     Defendants have knowingly converted Genometrica's intellectual property, financial assets, and elements of its Medical Device for their own use.

311.     As an actual and proximate result of Defendants' willful and intentional actions and Defendants' conspiracy, Genometrica has suffered damages through various means including, but not limited to, (i) loss of potential customers and/or entities that work with or have an interest in purchasing and/or investing in Genometrica's Medical Device, (ii) loss of NIH grants, (iii) harm to Genometrica's reputation, (iv) wastage and loss of Genometrica's investment in time, effort, and money, (v) loss of further development of Genometrica's Medical Device and second generation technology, and

(vi) loss of Genometrica's goodwill.

312.    As a result of the foregoing, Genometrica is entitled to an award of compensatory, consequential, and punitive damages for malicious and wanton conduct based upon the past and continuing embezzlement.  Further, Defendants should be directed to immediately account for all monies earned as a result of their embezzlement and disgorge same.

313.    As a direct and proximate result of Defendants' wrongful conduct, and as agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements, Defendants have caused Genometrica irreparable harm and injury.

314.    Defendants' acts are knowing and willful.

315.    Unless Defendants are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

## TENTH CLAIM FOR RELIEF

### BREACH OF CONTRACT
**(Against Gorbovitski and Gorfinkel)**

316.    Genometrica incorporates by reference the allegations contained in paragraphs 1-315 of the First Amended Complaint as though fully set forth herein.

317.    The Restrictive Covenants Agreements constitute legal, valid, and binding contracts between Genometrica and each of Gorbovitski and Gorfinkel.

318.    Certain surviving restrictive covenants contained therein, and the factual provisions that a remedy at law for a breach thereof would be inadequate and that injunctive relief would be warranted without the necessity of proving damages, remain in full force and effect.

319.    Each of Gorbovitski and Gorfinkel was aware of the Restrictive Covenants Agreements and the terms thereof as he/she was a willing signatory thereto with full legal capacity to execute and deliver the same.

320.    Under the surviving portions of the Restrictive Covenants Agreements, Gorbovitski and Gorfinkel were required, *inter alia*, (a) not to disclose, divulge, communicate and/or identify any confidential information to third parties, and (b) to not disclose, divulge, communicate and/or identify or make use of confidential information for their own profit or purposes.

321.    Gorbovitski and Gorfinkel breached the Restrictive Covenants Agreements by proceeding to *inter alia*, (i) copy, disclose, and share with ABMM Genometrica's confidential information, including its proprietary information and trade secrets, (ii) use Genometrica's confidential information, including its proprietary information and trade secrets, for purposes other than furthering Genometrica's interests, (iii) fail to protect Genometrica's confidential information, including its intellectual property, proprietary information and trade secrets, and (iv) fail to surrender and destroy Genometrica's confidential information in their actual or constructive possession, including its proprietary information and trade secrets and all supporting documents related thereto.

322.    As an actual and proximate result of Gorbovitski and Gorfinkel's willful and intentional actions and Defendants' conspiracy, Genometrica has suffered damages through various means including, but not limited to, (i) loss of potential customers and/or entities that work with or have an interest in purchasing and/or investing in Genometrica's Medical Device, (ii) loss of NIH grants, (iii) harm to Genometrica's

reputation, (iv) wastage of Genometrica's investment in time, effort, and money, (v) loss of further development of Genometrica's Medical Device and second generation technology, and (vi) loss of Genometrica's goodwill.

323.    As a result of the foregoing, Genometrica is entitled to an award of compensatory, consequential, and punitive damages for malicious and wanton conduct based upon the past and continuing breach of contract.  Further, Gorbovitski and Gorfinkel should be directed to immediately account for all monies earned as a result of their breach of contract and disgorge same.

324.    As a direct and proximate result of Gorbovitski's and Gorfinkel's wrongful conduct, and as agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements, Gorbovitski and Gorfinkel have caused Genometrica irreparable harm and injury.

325.    Gorbovitski's and Gorfinkel's acts are knowing and willful.

326.    Unless Gorbovitski and Gorfinkel are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

### ELEVENTH CLAIM FOR RELIEF

### TORTIOUS INTERFERENCE WITH CONTRACT
#### (Against All Defendants)

327.    Genometrica incorporates by reference the allegations contained in paragraphs 1-326 of the First Amended Complaint as though fully set forth herein.

328.    The Research Agreements constitute legal, valid, and binding contracts between Genometrica and the Foundation.

329.    Upon information and belief, Gorbovitski was at all relevant times aware of the Research Agreements and their terms as a signatory thereof and by reason of his position as President and a director of Genometrica and a principal shareholder thereof.

330.    Upon information and belief, Gorfinkel was at all relevant times aware of the Research Agreements and their terms because of her roles and responsibilities in the Foundation's performance thereof, because she was a principal shareholder of Genometrica, and because of her spousal relationship with Gorbovitski.

331.    Defendants interfered with and caused the Foundation to fail to fulfill the Foundation's obligations thereunder by, *inter alia*, not pursuing the necessary research and by not providing, and by causing Gorfinkel not to provide, reports required under the Research Agreements, and then by entering into an improper competing relationship with, and entering into and carrying out one or more competing Research Agreements between, the Foundation and ABMM.

332.    Defendants have interfered with the Foundation's Research Agreements with Genometrica for the purpose of inflicting intentional harm on Genometrica while enriching themselves with property belonging to Genometrica.

333.    As a direct result of Defendants' actions, Genometrica has suffered wastage of its investment and harm to its business and its business prospects.

334.    As a result of the foregoing, Genometrica is entitled to an award of compensatory, consequential, and punitive damages for malicious and wanton conduct based upon the past and continuing tortious interference of Defendants.  Further, Defendants should be directed to immediately account for all monies earned as a result of their tortious interference and to disgorge same and be ordered to transfer and assign to

Genometrica all of ABMM's intellectual property, patents and pending patents and all of

ABMM's research agreements with the Foundation and the fruits thereof, and be

prohibited from receiving any information or support from the Foundation and its

affiliates and from receiving any funds (and to return any funds received) from the NIH,

New York State or any other governmental agency.

335.    As a direct and proximate result of Defendants' wrongful conduct, and as

agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements,

Defendants have caused Genometrica irreparable harm and injury.

336.    Defendants' acts are knowing and willful.

337.    Unless Defendants are enjoined from their wrongful conduct, Genometrica

will suffer further irreparable injury and harm, for which it has no adequate remedy at

law.

**TWELFTH CLAIM FOR RELIEF**

**TORTIOUS INTERFERENCE WITH
<u>ADVANTAGEOUS BUSINESS RELATIONS</u>
(Against All Defendants)**

338.    Genometrica incorporates by reference the allegations contained in

paragraphs 1-337 of the First Amended Complaint as though fully set forth herein.

339.    Defendants interfered with and caused the Foundation to dilute and

partially cease its relationship with Genometrica, and caused Genometrica to cease its

research relationship with the Foundation, by enabling ABMM to enter into an improper

competing relationship and entering into and carrying out a competing Research

Agreement between the Foundation and ABMM.

340.    Defendants have interfered with Genometrica's business relations for the

purpose of inflicting intentional harm on Genometrica while enriching themselves with

property belonging to Genometrica.  As a direct result of Defendants' actions, Genometrica has suffered wastage of its investment and harm to its business and its business prospects.

341.    As a result of the foregoing, Genometrica is entitled to an award of compensatory, consequential, and punitive damages for malicious and wanton conduct based upon the past and continuing tortious interference.  Further, Defendants should be directed to immediately account for all monies earned as a result of their tortious interference and to disgorge same and be ordered to transfer and assign to Genometrica all of ABMM's intellectual property, patents and pending patents and all of ABMM's research agreements with the Foundation and the fruits thereof, and be prohibited from receiving any information or support from the Foundation and its affiliates and from receiving any funds (and to return any funds received) from the NIH, New York State or any other governmental agency.

342.    As a direct and proximate result of Defendants' wrongful conduct, and as agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements, Defendants have caused Genometrica irreparable harm and injury.

343.    Defendants' acts are knowing and willful.

344.    Unless Defendants are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

## THIRTEENTH CLAIM FOR RELIEF

## <u>USURPATION OF CORPORATE OPPORTUNITY</u>
### (Against All Defendants)

345.    Genometrica incorporates by reference the allegations contained in paragraphs 1-344 of the First Amended Complaint as though fully set forth herein.

346.    ABMM's research relationship with the Foundation, and all funds received by ABMM or the other Defendants from the NIH, New York State or any other governmental agencies were derived through Gorbovitski from the business, activities and relationships of Genometrica in the identical business in which ABMM embarked.

347.    Gorbovitski prepared grant applications in the name and on behalf of ABMM while he was employed by Genometrica.  Thus, Defendants wrongfully appropriated a corporate opportunity belonging to Genometrica.

348.    As a result of the foregoing, Genometrica is entitled to an award of compensatory, consequential, and punitive damages for malicious and wanton conduct based upon the misappropriation of Genometrica's corporate opportunity.  Further, Defendants' should be directed to immediately account for all monies earned as a result of their aforementioned unfair acts and to disgorge same and be ordered to transfer and assign to Genometrica all of ABMM's intellectual property, patents and pending patents and all of ABMM's research agreements with the Foundation and the fruits thereof, and be prohibited from receiving any information or support from the Foundation and its affiliates and from receiving any funds (and to return any funds received) from the NIH, New York State or any other governmental agency.

349.    As a direct and proximate result of Defendants' wrongful conduct, and as agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements,

Defendants have caused Genometrica irreparable harm and injury.

350.    Defendants' acts are knowing and willful.

351.    Unless Defendants are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

**FOURTEENTH CLAIM FOR RELIEF**

**COMMON LAW FRAUD**
**(Against All Defendants)**

352.    Genometrica incorporates by reference the allegations contained in paragraphs 1-351 of the First Amended Complaint as though fully set forth herein.

353.    On information and belief, Defendants falsely represented to the Foundation that ABMM had the legal right to enter into and carry out ABMM's research agreements with the Foundation, including use of the confidential information misappropriated by Defendants from Genometrica.

354.    On information and belief, Defendants falsely represented to the Foundation that the Foundation could legally give to the Defendants and that the Defendants, including ABMM, could legally receive (a) confidential information which in fact belonged to Genometrica, and (b) the science, intellectual property (including know-how) and the other benefits which had been developed pursuant to the Foundation's Research Agreements with Genometrica and at the expense of Genometrica.

355.    Defendants took these actions while Gorbovitski represented to Genometrica that he was a loyal employee acting in furtherance of Genometrica's business interests.  The representations made by Gorbovitski to Genometrica were taken

by Genometrica and relied upon by Genometrica to be legitimate and trustworthy, but were in fact materially false and misleading.  The representations were also false because Gorbovitski was acting on behalf of Defendants and against Genometrica's business interests.

356.    At all times, Defendants were engaged in a conspiracy to defraud Genometrica, and they did in fact do so.

357.    Defendants intended for Genometrica to rely upon Gorbovitski's false representations.  Due to Gorbovitski's positions with Genometrica, Genometrica reasonably relied upon Gorbovitski's representations to the detriment of Genometrica.

358.    In reasonable reliance upon those of the representations, which were made by Gorbovitski to Genometrica, Genometrica entrusted Gorbovitski with confidential information, including its intellectual property, proprietary information and trade secrets, and paid him a salary and gave him other benefits, i.e., contributions to Genometrica's 401k plan.  As part of Defendants' conspiracy to defraud Genometrica, Gorbovitski shared this information with the other Defendants.

359.    By reason of Genometrica's reasonable reliance upon representations of Gorbovitski, and by reason of Gorbovitski's false representations upon which Genometrica relied, Genometrica has been damaged.

360.    As a result of the foregoing, Genometrica is entitled to an award of compensatory, consequential, and punitive damages for malicious and wanton conduct based upon the fraud.  Further, Defendants should be directed to immediately account for all monies earned as a result of their fraud and to disgorge same and be ordered to transfer and assign to Genometrica all of ABMM's intellectual property, patents and

pending patents and all of ABMM's research agreements with the Foundation and the fruits thereof, and be prohibited from receiving any information or support from the Foundation and its affiliates and from receiving any funds (and to return any funds received) from the NIH, New York State or any other governmental agency.

361.    As a direct and proximate result of Defendants' wrongful conduct, and as agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements, Defendants have caused Genometrica irreparable harm and injury.

362.    Defendants' acts are knowing and willful.

363.    Unless Defendants are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

## FIFTEENTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
**(Against All Defendants)**

364.    Genometrica incorporates by reference the allegations contained in paragraphs 1-363 of the First Amended Complaint as though fully set forth herein.

365.    All Defendants received certain benefits without providing adequate consideration.

366.    Defendants have been enriched by, *inter alia*, stealing proprietary information from Genometrica, converting Genometrica's property for the benefit of Defendants, and charging unauthorized expenses to Genometrica.

367.    As a result of the foregoing, Defendants have been unjustly enriched at Genometrica's expense.  Defendants must turn over this unjust enrichment to Genometrica.

368.   As a result of the foregoing, Genometrica is entitled to an award of compensatory, consequential, and punitive damages for malicious and wanton conduct based upon the unjust enrichment.  Further, Defendants should be directed to immediately account for all monies earned as a result of their unjust enrichment and to disgorge same and be ordered to transfer and assign to Genometrica all of ABMM's revenues and profits, intellectual property, patents and pending patents and all of ABMM's research agreements with the Foundation and the fruits thereof, and be prohibited from receiving any information or support from the Foundation and its affiliates and from receiving any funds (and to return any funds received) from the NIH, New York State or any other governmental agency.

369.   As a direct and proximate result of Defendants' wrongful conduct, and as agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements, Defendants have caused Genometrica irreparable harm and injury.

370.   Defendants' acts are knowing and willful.

371.   Unless Defendants are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

## SIXTEENTH CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY
### (Against Gorbovitski)

372.   Genometrica incorporates by reference the allegations contained in paragraphs 1-371 of the First Amended Complaint as though fully set forth herein.

373.   As the sole officer and director of Genometrica during all relevant times, Gorbovitski had a fiduciary duty to act with loyalty to and in the best interest of

Genometrica.

374.    Gorbovitski breached that fiduciary duty by, *inter alia*, (i) diverting NIH grant opportunities to ABMM, (ii) pilfering Genometrica's financial assets for personal use and to fund ABMM, (iii) pilfering Genometrica's intellectual property and elements of Genometrica's Medical Device for the benefit of ABMM, (iv) directing commercialization opportunities to ABMM, (v) failing to properly supervise the Foundation's performance of Genometrica's Research Agreements, and (vi) failing to further the development of Genometrica's Medical Device and second generation technology.

375.    The breaches of Gorbovitski's fiduciary duties have been made possible through Defendants' various relationships with Genometrica, Stony Brook, and the Foundation, and by conspiring with each other.

376.    As an actual and proximate result of Gorbovitski's willful and intentional actions and Defendants' conspiracy, Genometrica has suffered damages through various means including, but not limited to, (i) loss of potential customers and/or entities that work with or have an interest in purchasing and/or investing in Genometrica's Medical Device, (ii) loss of NIH grants, (iii) harm to Genometrica's reputation, (iv) wastage of Genometrica's investment in time, effort, and money, (v) loss of further development of Genometrica's Medical Device and second generation technology, and (vi) loss of Genometrica's goodwill.

377.    As a result of the foregoing, Genometrica is entitled to an award of compensatory, consequential, and punitive damages for malicious and wanton conduct based upon these breach of fiduciary duties.  Further, Gorbovitski should be directed to

immediately account for all monies earned as a result of their aforementioned breach of fiduciary duties.

378.    As a direct and proximate result of Gorbovitski wrongful conduct, and as agreed by Gorbovitski in his Restrictive Covenants Agreement, Gorbovitski has caused Genometrica irreparable harm and injury.

379.    Gorbovitski's acts are knowing and willful.

380.    Unless Gorbovitski is enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

## SEVENTEENTH CLAIM FOR RELIEF

## <u>AIDING AND ABETTING BREACH OF FIDUCIARY DUTY</u>
### (Against Gorfinkel and ABMM)

381.    Genometrica incorporates by reference the allegations contained in paragraphs 1-380 of the First Amended Complaint as though fully set forth herein.

382.    As the sole officer and director of Genometrica during all relevant times, Gorbovitski had a fiduciary duty to act with loyalty to and in the best interest of Genometrica.

383.    Gorbovitski breached that fiduciary duty by, *inter alia*, (i) diverting NIH grant opportunities to ABMM, (ii) pilfering Genometrica's financial assets for personal use and to fund ABMM, (iii) pilfering Genometrica's intellectual property and elements of Genometrica's Medical Device for ABMM, (iv) directing commercialization opportunities to ABMM, (v) failing to properly supervise the Foundation's performance of Genometrica's Research Agreements, and (vi) failing to further the development of Genometrica's Medical Device and second generation technology.

384.     Gorfinkel and ABMM conspired with and/or knowingly induced or participated in Gorbovitski's breach of his fiduciary duties to Genometrica and affirmatively helped Gorbovitski conceal his actions.

385.     As Gorbovitski's wife, Gorfinkel at all times knew about Gorbovitski's bad acts.  Gorfinkel has, *inter alia*, failed to fulfill her obligations as PI/PD under Genometrica's Research Agreements with the Foundation by, among other things, not completing research and not preparing research reports for Genometrica; and she also has performed research and, on information and belief, prepared research reports on behalf of the Foundation under the Foundation's Research Agreements with ABMM.

386.     As Gorbovitski's *alter ego*, ABMM at all times knew about Gorbovitski's bad acts.  ABMM has, *inter alia*, used Genometrica's intellectual property and financial assets for its own benefit and provided Gorbovitski with a vehicle with which to divert corporate opportunities belonging to Genometrica, including NIH grants and commercialization opportunities.

387.     Gorfinkel's and ABMM's conspiring with Gorbovitski, and their aiding and abetting Gorbovitski's breaches of his fiduciary duties, have been made possible through Defendants' various relationships with Stony Brook, the Foundation and Genometrica and by conspiring with each other.

388.     As an actual and proximate result of Gorfinkel and ABMM's willful and intentional actions and Defendants' conspiracy, Genometrica has suffered damages through various means including, but not limited to, (i) loss of potential customers and/or entities that work with or have an interest in purchasing and/or investing in Genometrica's Medical Device, (ii) loss of NIH grants, (iii) harm to Genometrica's

reputation, (iv) wastage of Genometrica's investment in time, effort, and money, (v) loss of further development of Genometrica's Medical Device and second generation technology, and (vi) loss of Genometrica's goodwill.

389.    As a result of the foregoing, Genometrica is entitled to an award of compensatory, consequential, and punitive damages for malicious and wanton conduct based upon these acts of aiding and abetting breach of fiduciary duty.  Further, Defendants should be directed to immediately account for all monies earned as a result of their aforementioned aiding and abetting breach of fiduciary duty.

390.    As a direct and proximate result of Gorfinkel and ABMM's wrongful conduct, and as agreed by Gorfinkel in her Restrictive Covenants Agreement, Gorfinkel and ABMM have caused Genometrica irreparable harm and injury.

391.    Gorfinkel and ABMM's acts are knowing and willful.

392.    Unless Gorfinkel and ABMM are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

### NINETEENTH CLAIM FOR RELIEF

### <u>CONSTRUCTIVE TRUST</u>
**(Against all Defendants)**

393.    Genometrica incorporates by reference the allegations contained in paragraphs 1-392 of the First Amended Complaint as though fully set forth herein.

394.    Defendants breached their fiduciary duty and/or aided and abetted in the breach of fiduciary duty owed to Genometrica by engaging in a pattern of tortious activity and misrepresentations and by using their positions and affiliations to obtain Genometrica's property.

395.    More particularly, Defendants breached their fiduciary duty and/or aided and abetted in the breach of fiduciary duty by, *inter alia*, (i) diverting NIH grant opportunities to ABMM, (ii) pilfering Genometrica's financial assets for personal use and to fund ABMM, (iii) pilfering Genometrica's intellectual property and elements of its Medical Device for the benefit of ABMM, (iv) directing commercialization opportunities to ABMM, (v) failing to properly supervise the Foundation's performance of Genometrica's Research Agreements, and (vi) failing to further the development of Genometrica's Medical Device and second generation technology.

396.    A constructive trust should be imposed on Defendants and all property or things of value traceable to or derived from such property in favor of and for the benefit of Genometrica.

397.    By reason of the foregoing, Genometrica is entitled to a constructive trust.

### TWENTIETH CLAIM FOR RELIEF

### *PRIMA FACIE* TORT
**(Against All Defendants)**

398.    Genometrica incorporates by reference the allegations contained in paragraphs 1-397 of the First Amended Complaint as though fully set forth herein.

399.    All Defendants conspired to and did purposefully, intentionally and/or negligently cause harm to Genometrica through their wrongful actions.  As Gorbovitski's wife, Gorfinkel was fully aware of the terms of his employment with Genometrica and of his and her own Restrictive Covenants Agreement with Genometrica.

400.    Gorfinkel and ABMM encouraged, supported, and facilitated Gorbovitski's improper actions.

401.    In doing so, Gorfinkel and ABMM intentionally harmed Genometrica.

402.    Defendants' conduct was related to their desire to maliciously undercut Genometrica to the financial benefit of Defendants.

403.    Defendants' actions were malicious towards Genometrica.  Through their conspiratorial acts, threats by Gorfinkel and their encouragement, support, and facilitation of Gorbovitski's actions, Defendants intended and desired to inflict injury upon Genometrica for their own financial benefit.

404.    As a result of Defendants' acts, Genometrica has suffered special damages, including the loss of proprietary information and trade secrets, an increase of expenses, and the loss or diminution in future earnings.

405.    As a result of the foregoing, Genometrica is entitled to an award of compensatory, consequential, and punitive damages for malicious and wanton conduct based upon their tortious acts.  Further, Defendants should be directed to immediately account for all monies earned as a result of their tortious acts and to disgorge same and be ordered to transfer and assign to Genometrica all of ABMM's intellectual property, patents and pending patents and all of ABMM's research agreements with the Foundation and the fruits thereof, and be prohibited from receiving any information or support from the Foundation and its affiliates and from receiving any funds (and to return any funds received) from the NIH, New York State or any other governmental agency.

406.    As a direct and proximate result of Defendants' wrongful conduct, and as agreed by Gorbovitski and Gorfinkel in their Restrictive Covenants Agreements, Defendants have caused Genometrica irreparable harm and injury.

407.    Defendants' acts are knowing and willful.

408.    Unless Defendants are enjoined from their wrongful conduct, Genometrica will suffer further irreparable injury and harm, for which it has no adequate remedy at law.

**WHEREFORE**, Plaintiff Genometrica Research Inc. prays and respectfully requests the following relief:

1.    Declaratory judgment concerning the extent of Genometrica's property rights in, *inter alia*, intellectual property, inventions, and other assets over which ABMM maintains actual or constructive possession.

2.    Defendants, their officers, agents, servants, employees and attorneys, and all others holding by, through or under Defendants, or in active concert or participation with Defendants, be preliminarily and permanently enjoined and restrained from (i) infringing U.S. Letters Patent Nos. 7,402,817 B2; 6,944,407 B2; 6,934,030 B2; 6,771,367 B2; 6,760,109 B2; 6,759,247 B2; 6,528,801 B1; 6,497,804 B1; 6,475,362; 6,464,852 B1; 6,038,023 A3; and 5,784,157; and (ii) passing off, palming off, or assisting in passing off or palming off, Genometrica's goods, or services, or intellectual property as those of Defendants, or otherwise continuing any and all acts of unfair competition as alleged in this Complaint.

3.    Defendants be required to:

a.    account for as trustee *ex maleficio* and pay to Genometrica all profits, plus interest, derived by Defendants from their aforesaid acts;

b.    account for the expenditure by ABMM of all of the NIH grant monies it received as well as any and all other monies raised or received by ABMM from other sources;

c.  pay to Genometrica the amount, plus interest, that Gorbovitski and
Gorfinkel received for the 600,000 shares of Genometrica stock that they
received collectively for no consideration;

d.  to transfer and assign to Genometrica all of ABMM's intellectual
property, patents and pending patents, and all of ABMM's research
agreements with the Foundation and the fruits thereof, and be prohibited
from receiving any information or support from the Foundation and its
affiliates and from receiving any funds (and to return any funds received)
from the NIH, New York State, or any other governmental agency;

e.  disgorge all revenues and profits that ABMM has received as a result of
the ABMM Sequencer and any related research and the fruits thereof,
along with all remaining assets of ABMM;

f.  deliver to Genometrica or, at Genometrica's option, deliver up for
destruction, all packages, literature, labels, advertising and other materials
of an infringing, false, misleading or unfair nature in Defendants' actual or
constructive possession or control, all prototypes, equipment and all
means of making the ABMM Sequencer;

g.  use their best efforts to recall from the trade any and all ABMM
Sequencers; and

h.  file with this Court and serve on Plaintiff a report in writing, under oath,
setting forth in detail the manner and form in which Defendants have
complied with the terms of any injunction entered by this Court.

4.     Genometrica be awarded actual, compensatory, punitive, and exemplary damages in an amount to be determined at trial, but not less than $10,000,000 (ten million dollars).

5.     Genometrica be awarded actual, compensatory, punitive, and exemplary damages by reason of Defendant's patent infringement as set forth in these claims (35 U.S.C. §§ 271 *et seq*.) in an amount to be determined at trial, but not less than $10,000,000 (ten million dollars);

6.     Genometrica be awarded actual, compensatory, punitive, and exemplary damages by reason of Defendants' unfair competition as set forth in these claims (15 U.S.C. §§ 1117(a) and 1125(a)) in an amount to be determined at trial, but not less than $10,000,000 (ten million dollars).

7.     The Court declare this case exceptional pursuant to 15 U.S.C. §§ 1117(a) and 1125(a) and under New York General Business Law § 349, and award Genometrica its costs and expenses in this action, together with reasonable attorneys' fees, as well as treble damages.

8.     Defendants, and all persons acting in concert or participating with them be preliminarily and permanently enjoined from:

     a. engaging in false designations of origin, false description, false advertising or false representations or otherwise engaging in unfair business or deceptive trade practices or competing unfairly with Plaintiff;

     b. any other conduct that is likely to cause confusion or to cause mistake or to deceive as to the source, affiliation, connection, or association of

Genometrica's  products or services with those of the Defendants; or the

qualities, origin or nature of Defendants' ABMM Sequencer; and

c.   (i) copying, disclosing, and sharing with ABMM Genometrica's

confidential information, including its proprietary information, trade

secrets, patents, patents pending, and intellectual property, (ii) using

Genometrica's confidential information, including its proprietary

information, trade secrets, patents, patents pending, and intellectual

property for purposes other than furthering Genometrica's interests, (iii)

failing to protect Genometrica's confidential information, including its

proprietary information, trade secrets, patents, patents pending, and

intellectual property, and (iv) failing to surrender and destroying

Genometrica's confidential information, including its proprietary

information , trade secrets, patents, patents pending, and intellectual

property, and all supporting documents related thereto in their actual or

constructive possession.

9.   Gorfinkel, and all persons acting in concert or participating with her, be

preliminarily and permanently enjoined:

a.   to produce the research reports that are due under Genometrica's Research

Agreements;

b.   from doing research for ABMM because the funding from the NIH to be

used by ABMM to pay for such research was wrongfully obtained by the

Defendants; and

    c.   to disclose to the Foundation any and all inventions made under Genometrica's Research Agreements that she has not already disclosed to the Foundation.

10.    Defendants be required to file with this Court and serve on the undersigned counsel for the Plaintiff Genometrica within thirty (30) days after the entry of judgment a written report under oath setting forth in detail the manner in which Defendants have complied with the injunction ordered by this Court in accordance with 15 U.S.C § 1116.

11.    A constructive trust in favor of and for the benefit of Genometrica be imposed upon Defendants and all property or things of value traceable to or derived from such property.

12.    Genometrica be awarded such other and further relief as this Court may deem just and proper.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## JURY DEMAND

Pursuant to Rule 38(d) of the Federal Rules of Civil Procedure, Plaintiff

Genometrica Research Inc. demands a trial by jury on all issues so triable by right.

Dated: New York, New York
April 2, 2012

HOFHEIMER GARTLIR & GROSS, LLP
Robert Kenney
Nicholas B. Malito
530 Fifth Avenue
New York, New York  10036
Telephone: 212-818-9000
Facsimile: 212-869-4930
rkenney@hgg.com
nmalito@hgg.com

-and-

INTELLECTULAW
THE LAW OFFICES OF P.B.
TUFARIELLO, P.C.

By:      _s/ PanagiotaBettyTufariello/s
Panagiota Betty Tufariello
25 Little Harbor Road
Mount Sinai, New York  11766
Telephone: 631-476-8734
Facsimile: 631-476-8737
betty@intellectulaw.com

(631) 476-8734

*Attorneys for Plaintiff*